STATE OF NORTH CAROLINA v. WILLIE EDWARD McZORN

No. 44

(Filed 5 November 1975)

1. **Searches and Seizures § 1; Arrest and Bail § 3— stop and frisk — discovery of weapon — arrest without warrant**

The stopping of defendant's vehicle and the frisking of his person were constitutional where: an officer had received information less than an hour earlier from a known informant of proven reliability that defendant was at a certain "beer joint," that defendant was driving a '74 green Chevrolet Vega, and that defendant had on his person a .38 revolver used in a robbery and murder; as the officer was cruising the area where defendant was reported to be, he encountered defendant coming toward him in his car; the officer effected a stop by use of his siren and lights; and the officer frisked defendant and found a loaded .38 caliber revolver in his inside pocket; moreover, as soon as the frisk revealed that defendant was carrying a revolver, the officer properly arrested him without a warrant for carrying a concealed weapon in violation of G.S. 14-268, and the revolver was properly admitted into evidence at his subsequent trial for murder and robbery. G.S. 15-41(1) (now G.S. 15A-401(b)).

2. **Criminal Law § 75— volunteered in-custody statement — officer's request for explanation — failure to give further Miranda warnings**

Where defendant's statement to officers that he had shot decedent was volunteered after all police interrogation had ceased, an officer's request that defendant explain what happened did not render defendant's subsequent detailed statement the product of custodial interrogation, and no further *Miranda* warnings were required prior to the statement.

3. **Criminal Law § 75— necessity for repetition of Miranda warnings**

Repetition of the *Miranda* warnings is generally not required where no inordinate time elapses between the interrogations, the subject matter of the questioning remains the same, and there is no evidence that in the interval between the two interrogations anything occurred to dilute the first warning; however, the need for the second warning is to be determined by the totality of the circumstances.

4. **Criminal Law § 75— necessity for repetition of Miranda warnings — totality of circumstances — factors considered**

Courts have included the following factors, among others, in the totality of circumstances which determine whether the initial *Miranda* warnings have become so stale and remote that there is a substantial possibility the individual was unaware of his constitutional rights at the time of the subsequent interrogation: (1) the length of time between the giving of the first warnings and the subsequent interrogation; (2) whether the warnings and the subsequent interrogation were given in the same or different places; (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers; (4) the extent to which the sub-

sequent statement differed from any previous statements; and (5) the apparent intellectual and emotional state of the suspect.

**5. Criminal Law § 75— second interrogation — failure to repeat Miranda warnings**

Defendant's confession was not rendered inadmissible by the failure of the officer to repeat the *Miranda* warnings, which had been given prior to the initial interrogation of defendant, where the confession occurred only 20-30 minutes after the initial interrogation terminated, the subsequent interrogation was conducted in the same room and by the same officer who gave the initial warnings, the confession was not inconsistent with any earlier statements by defendant, and there is no indication that defendant was so intellectually deficient or emotionally unstable that he had forgotten his constitutional rights that had been fully explained to him a short time earlier.

**6. Criminal Law § 75— confession — failure to notify family of arrest**

Defendant's confession was not coerced and rendered inadmissible by the failure of officers to notify the 24-year-old defendant's family and girl friend that he was in custody before they began to interrogate him.

**7. Criminal Law § 26; Homicide § 31— murder in perpetration of robbery — different victims — punishment for robbery**

Where the State prosecuted defendant for first degree murder on the theory that he killed decedent while engaged in the perpetration of the felony of armed robbery of decedent's son, the armed robbery was an essential element of the charge of first degree murder, and no separate punishment can be imposed for the robbery.

APPEAL by defendant under G.S. 7A-27(a) from *Gavin, J.,* 3 March 1975 Session of MOORE County Superior Court.

Defendant was tried upon two bills of indictment. One charged him with the armed robbery of Kenneth McAskill on 6 January 1975; the other, drawn under G.S. 15-144, charged him with the murder of John Henry McAskill on the same day. The State offered evidence that tended to show the facts summarized below:

The deceased, John Henry McAskill (Mr. McAskill), owned and operated a grocery and filling station known as Honeycutt's Grocery Store in West End in Moore County. About 6:45 p.m. on 6 January 1975, two black men entered the store. The first man was approximately six feet tall and weighed about 160 pounds. He was dressed in heavy green military fatigues, carried a revolver, and wore a brown and gold ski mask pulled down over his face. The second man, who was shorter and

heavier, carried a sawed-off shotgun. He too wore a fatigue jacket and mask.

When the two men entered, Mr. McAskill was dozing by the store's heater in a chair which faced the doorway. His son, Kenneth McAskill (Kenneth), aged 19, was sitting opposite him. No one else was in the store. Thinking that the men were prospective customers, Kenneth rose to serve them. At that time, the first man pointed the revolver at Kenneth and demanded his money, saying, "This is a hold-up." When Kenneth reached for the billfold in his hip pocket the man ordered him to stop and to turn sideways so that he could see for what he was reaching. Kenneth complied with his demands and, as the man continued to hold the revolver on him, he handed over his billfold containing approximately fifteen dollars.

During this time the other man was holding the shotgun on Mr. McAskill, who had awakened. As he raised himself in the chair, the first man shouted, "Get him." One of the men shot Mr. McAskill, and both then ran from the store. Kenneth went immediately to a nearby trailer and telephoned for the police and for an ambulance. Both responded within minutes, and Mr. McAskill was taken to the hospital, where he died a short time later as the result of the gunshot wound.

Deputy Sheriff Watkins arrived at the scene about 7:00 p.m. After questioning Kenneth, who was still there and "terribly upset," Deputy Watkins began his investigation. When he found two sets of footprints leading from the store in the direction the men had fled, bloodhounds were called, and they followed the tracks to a cemetery. There the officers found automobile tire tracks, and at that point the footprints stopped.

The following morning Dr. R. L. Stuber, Chief Medical Examiner of Moore County, autopsied the body of Mr. McAskill and removed therefrom a bullet which he delivered to Deputy Watkins. This bullet had entered the left side of Mr. McAskill's neck and lodged in his spine. In Dr. Stuber's opinion, this bullet (State's Exhibit 6) had caused Mr. McAskill's death.

On 18 January 1975 at about 11:00 p.m., Deputy Watkins accompanied by SBI Agent Bill Dowdy, stopped a green Vega automobile driven by defendant. Deputy Watkins frisked defendant and found a loaded .38 caliber revolver in his inside coat pocket. Thereupon, defendant was placed under arrest for

carrying a concealed weapon. At trial the judge conducted a *voir dire* to determine the validity of the arrest, which was made without a warrant, and the admissibility of the revolver into evidence. On *voir dire*, the testimony of Deputy Watkins tended to show the following facts.

Approximately two days before defendant was arrested on 18 January 1975, Deputy Watkins received information from a confidential informant that defendant had a .38 caliber revolver. During the six months prior to 18 January 1975, on 20-25 occasions, this informant had given Watkins information which was proven to be reliable. Prior to January 18th Watkins did not know of defendant's existence. On that date, about one hour before defendant was arrested, the same informant told Deputy Watkins that defendant had concealed on his person a .38 revolver; that it was the weapon which had killed Mr. McAskill; and that defendant and another man had committed the armed robbery and murder in West End. He also said that defendant was driving a green 1974 Vega and that he was at a particular bar in Southern Pines. Under the circumstances Watkins felt it would be unwise to take the time to procure a search warrant. Defendant "was out with his automobile" and there was "a good possibility" he would leave town or dispose of the weapon before the officers could get a search warrant and relocate him. Deputy Watkins and SBI Agent Dowdy, therefore, proceeded to the bar where defendant was reported to be. When they arrived, defendant was no longer there. After checking two more bars in the area which the informant had said defendant frequented, the officers were proceeding to still another bar when they passed defendant in his green 1974 Vega. Deputy Watkins stopped the Vega and identified himself to the defendant, who was the sole occupant of the car. After asking for defendant's driver's license, Deputy Watkins asked him to get out of his car which he did. The deputy then instructed defendant to put his hands on the car and told him he had been informed he was carrying a concealed weapon. At that point Watkins "frisked him down" and found the .38 revolver (State's Exhibit 5), loaded with five rounds of ammunition, in defendant's inside coat pocket.

Upon discovering the gun Watkins told him he was under arrest for carrying a concealed weapon. Defendant's reply was; "If I [had known] that was the reason you were stopping me, I would have killed all of you, or you would have had to kill me." He said he would never have been taken alive.

Upon findings supported by the foregoing evidence, the trial judge concluded that the arrest and accompanying search were valid, and he admitted the revolver into evidence. Thereafter, before the jury, Watkins gave substantially the same testimony with reference to this on-the-scene arrest of defendant and the seizure of the pistol.

Immediately after arresting defendant, Deputy Watkins and Agent Dowdy took him to the Southern Pines Police Department. There, about 11:30 p.m., Dowdy told defendant he wanted to talk to him about the murder of John McAskill and the robbery of his son. He then advised defendant of his constitutional rights in strict conformity with the requirements of *Miranda v. Arizona,* 384 U.S. 436 (1966). He informed defendant, *inter alia,* of his right to the advice and presence of counsel before and during police questioning, and defendant was told that if he was indigent and desired an attorney one would be appointed for him. He said he understood his rights and did not desire an attorney; that he was ready to talk to the officers.

At this point in the trial defendant requested a *voir dire* and, in the absence of the jury, Dowdy gave testimony which, in pertinent part, is summarized below.

Defendant is 24 years old. Dowdy questioned him in the presence of Deputy Watkins in the office of the Chief of Police. Defendant was not handcuffed; he did not appear to be ill or under the influence of alcohol or drugs. No threats, promises, or inducements of any kind were made to defendant. During the first 30-40 minutes of the interview defendant was questioned about his family background, education, military service, and where he had lived and worked. Defendant cooperated fully and spoke freely on these subjects, and he said he had purchased the pistol (Exhibit 5) on 3 January 1975 from an unknown black male.

When Dowdy asked defendant if he had bought any .38 ammunition he replied that he had not. Dowdy then informed him that the records of a hardware store in Aberdeen showed that he had purchased such ammunition there prior to 6 January 1975; that the police knew two black males had gone into McAskill's store, robbed the boy, and shot Mr. McAskill; that the two men had parked on a back road and walked around the store before going inside; that the description of one of the men fitted defendant; that the officers had casts of the tire

tracks and of the footprints which led to the tire tracks; and that tests would be made to ascertain if the bullet removed from Mr. McAskill's body was fired from defendant's gun.

Upon receiving the foregoing information defendant said, "I do not want to say anything else at this point." Agent Dowdy terminated the interrogation and asked SBI Agent Inscoe to obtain a description of defendant, his vital statistics, and the other information required for the police records. Dowdy then left the room to make arrangements for the firearms examiner to determine whether the bullet was fired from defendant's pistol.

About 20-30 minutes later, Agent Dowdy came back into the room, and Deputy Sheriff Watkins served upon defendant the murder warrant he had obtained. Dowdy then asked defendant if there was anything he could do for him. Defendant made three requests: that Dowdy call his parents and his brother; that he go "up and talk to his girl friend" and "be discreet"; and that he get him some cherry lifesavers. Dowdy told defendant he would do the three things he requested and, at that point, defendant said to him, "I might as well tell you about it, but I am going to take the blame for all of it. . . . I shot McAskill."

In response to Dowdy's request that he "explain what happened," defendant made the statement which, as related by Dowdy, is summarized below.

On the night of January 6th defendant and his "partner" drove from Southern Pines to West End in defendant's green '74 Vega, parked it on a dirt road on the edge of a cemetery, and walked across a railroad track and a field to the back of McAskill's store. Through a window they saw a boy and an old man, who was sitting in a chair. Defendant and his partner, both wearing ski masks, went into the store. Defendant, carrying the pistol, which the officers subsequently took from him, entered first. Upon demand, the boy gave him his wallet. At that time the old man started going in his back pocket and defendant thought he had a gun. Defendant later changed this to say that the old man pulled a gun and pointed it at his partner. Defendant told his partner "to get him." The partner "would not do anything"; so he shot the old man, who fell to the floor. They ran out the door and back to the car in the same direction from whence they came. There was $15 in the

boy's wallet, which was thrown away somewhere along the road as they returned to Southern Pines. They divided the fifteen dollars between them, but his partner gave him fifty cents more for his gasoline.

Defendant refused to describe the gun his partner was carrying or to name him. He said they had made a pact—if one got caught he would not tell on the other. He told the officers that the ski masks were in the closet in his room at his parents' home and gave them permission to obtain them. He also gave permission to make casts of his automobile tires and of his shoes.

Dowdy's interview with defendant began about 11:30 p.m. and was concluded at 12:20 or 12:30 a.m.

Defendant's testimony on *voir dire,* summarized except when quoted, tended to show the following:

After he was taken to Chief Seawell's office in Southern Pines they began trying to get him to confess to a murder and attempted robbery. He denied everything and kept denying it, but finally he confessed because (he said) "it was my car and my gun used and it's being loyal to some friends." Mr. Dowdy read him his rights and he thought he understood them but evidently he didn't since he had confessed "to something like that." Defendant also said that the officers told him if he "would talk, they would talk to the solicitor and to the judge and he would take that into consideration and go easy on [him]."

On cross-examination defendant stated that he had not been drinking or taking drugs; that when he was arrested he knew the pistol he was carrying had been used in the robbery and shooting; and that the officers did not threaten him during their interrogation but the situation made him scared and nervous. He said anyone would be frightened if his car had been used in an armed robbery and if he were found with the gun that had killed a man. Defendant said he knew who killed Mr. McAskill and robbed Kenneth but he would not tell.

With reference to his actual confession defendant testified:

"At one point I told Mr. Dowdy I did not want to say anything further. Some 20 or 25 minutes later he came back in the room and asked me if he could do anything. That's when I told

him I wanted my parents and my girl friend contacted and for him to get me some cherry Lifesavers. He said he would do those things. I think it was then that I told him that I might as well tell him about it. I told him about it without being asked any questions about the murder or the robbery. He was asking me about the murder. I think it was anywhere from five to ten minutes before I told him that I might as well tell him about it. That he had been asking me about the murder. I told him that I had shot McAskill and that I was going to take all the blame only because they were trying to pick up innocent people. . . . I told them that I had made a pact with others that I wasn't going to tell about them. I told Mr. Dowdy how the crimes had been committed. Because I had been lending my car to other guys to use and they would do these things and tell me about them so I knew just about what was going on. I told Mr. Dowdy how the crime had been committed, where the car was parked, how the building was entered and where Mr. McAskill and his son were in the store at the time of the robbery. I did not necessarily have to be there in order to describe how the crime was committed because I had been by there several times and I knew where the guys had parked the car."

At the conclusion of the *voir dire* the court found that defendant's confession was freely, voluntarily and understandingly made after he had been fully informed and warned of all his constitutional rights and after he had expressly waived the presence of counsel; that no threats or promises had been made to defendant to secure his confession; and that defendant's statement was admissible in evidence. Thereafter, in conformity with his testimony on the *voir dire*, Agent Dowdy then testified before the jury as to the content of defendant's statement to him and the circumstances under which it was made.

F. G. Satterfield, a firearms examiner for the State Bureau of Investigation, whom the court found to be an expert in the identification of firearms, testified that he had test-fired defendant's pistol, Exhibit 5, and compared the test bullets with the bullet, Exhibit 6; that, in his opinion, Exhibit 6 was fired in Exhibit 5 and that it could not have been fired in any other weapon.

Deputy Watkins, recalled, testified that between 12:30 a.m. and 1:00 a.m. on 19 January 1975 he went to defendant's residence, "explained to Mr. and Mrs. McZorn exactly what had

happened," told them defendant had given the officers his permission to look for the masks at the bottom of his closet and secured their permission. He found the masks where defendant said they would be. The two masks were introduced in evidence, and the State rested its case.

At the conclusion of the State's evidence defendant informed the court that he was exercising his right to remain silent and would offer no evidence. Counsel for defendant told the court that he had explained to defendant that, since he had offered no evidence, his counsel was entitled to make the closing argument to the jury; that notwithstanding, defendant wanted his case submitted to the jury without argument. Upon the court's inquiry defendant confirmed counsel's statement. Whereupon the judge charged the jury. Thereafter the jury returned verdicts that "defendant is guilty of robbery with a firearm as charged in the bill of indictment," and that "defendant is guilty of murder in the first degree as charged in the bill of indictment."

Upon the conviction of robbery with a firearm the court adjudged that defendant be imprisoned for the term of 30 years. Upon the conviction of murder in the first degree, the court imposed the sentence of death. From the sentence of death defendant appealed directly to this Court as a matter of right and, under G.S. 7A-31(a), we certified his conviction of armed robbery for initial appellate review at the same time.

*Attorney General Rufus Edmisten, by Assistant Attorney General Ann Reed for the State.*

*William D. Sabiston, Jr., for defendant appellant.*

SHARP, Chief Justice.

[1] Defendant's assignments of error, as brought forward in his brief, pose three questions. We consider first the contention that the stopping of defendant's vehicle and the frisking of his person were unconstitutional; that his subsequent arrest was in violation of G.S. 15-41; and that, in consequence, the revolver taken from his inside coat pocket was erroneously admitted into evidence. We find no merit in these contentions.

In our view, the facts of this case are illustrative of a proper stop and incident frisk, and are encompassed by the rationale of *Adams v. Williams*, 407 U.S. 143, 32 L.Ed. 2d 612,

92 S.Ct. 1921 (1972) and *Terry v. Ohio,* 392 U.S. 1, 20 L.Ed. 2d 889, 88 S.Ct. 1868 (1967). *See, e.g. Johnson v. Wright,* 509 F. 2d 828 (5th Cir. 1975) (U. S. App. Pending); *United States v. Stevens,* 509 F. 2d 683 (8th Cir. 1975), *cert. denied,* 95 S.Ct. 1993 (1975); *United States v. Jefferson,* 480 F. 2d 1004 (4th Cir. 1973), *cert. denied,* 414 U.S. 1001, 38 L.Ed. 2d 236, 94 S.Ct. 354 (1973); *State v. Streeter,* 283 N.C. 203, 195 S.E. 2d 502 (1973).

In *Terry v. Ohio, supra,* the defendant was arrested for carrying a concealed weapon and subsequently convicted of that charge largely on the basis of the introduction into evidence of the weapon seized from him. The United States Supreme Court affirmed the conviction enunciating in the process a rationale which has been labeled the "stop and frisk" doctrine. In *Terry,* a police officer with thirty-nine years of experience, while patrolling his assigned area, observed defendant Terry and a companion repeatedly walk by a particular store gazing into its window. At one point Terry and his companion conferred with a third man after which they resumed their "measured pacing, peering and conferring." The officer suspected that the two men were "casing" the store in order to rob it either immediately or later. He therefore approached the men, identified himself, and asked their names. Receiving an inadequate response, the officer grabbed the defendant and patted down the outside of his clothing. When he felt what he believed to be a weapon, the officer reached inside the defendant's coat and removed a revolver. At his trial the defendant contended that the weapon was illegally seized because the officer lacked probable cause for both the stop and the frisk that revealed the weapon.

The United States Supreme Court held that, although the policeman's conduct in Terry was subject to Fourth Amendment limitation of reasonableness, the officer's conduct was permissible and the weapon was properly seized even though there was initially no probable cause for the intrusion. The Court held that since the officer could point to articulable facts that led him reasonably to conclude that criminal activity was afoot, he was justified in approaching the defendant for the purpose of investigating his suspicious activity. Although the Court declined expressly to decide whether facts not amounting to probable cause could justify an "investigative seizure," (392 U.S. at 19, n. 16, 20 L.Ed. 2d 889, 88 S.Ct. 1868), it said that "a

police officer may in appropriate circumstances and in an appropriate manner approach a person for the purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio, supra* at 22, 20 L.Ed. 2d 906, 88 S.Ct. 1880. In addition, since the facts and circumstances showed that the officer was reasonably warranted in believing the defendant was armed and presented a threat to his safety, the officer was justified in conducting a limited frisk which produced the weapon. In this regard, Chief Justice Warren, delivering the opinion of the Court, said: "Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." 392 U.S. at 27; 20 L.Ed. 2d at 909, 88 S.Ct. at 1883.

The implication of *Terry v. Ohio* was that an officer could stop a person if *upon personal observation* of that individual's conduct the officer could reasonably suspect that criminal activity was afoot. This holding was expanded four years later by *Adams v. Williams*, 407 U.S. 143, 32 L.Ed. 2d 612, 92 S.Ct. 1921 (1972), which held that an officer could, upon the basis of information furnished him by a reliable informant, stop a person if the informant's tip was sufficient to justify a reasonable belief that a crime had been or was being committed.

In *Adams v. Williams, supra,* a person known to Police Sergeant (C) approached his cruiser at 2:15 a.m. and told him that a person seated in a nearby vehicle was carrying narcotics and had a gun at his waist. In consequence C went to the car, tapped on the window and requested the defendant to open the door. When, instead of doing so, the defendant rolled down the window, C reached into the car and removed a fully loaded revolver from his belt. The gun had not been visible to C from outside the car, but it was where the informant had said it would be. C then arrested the defendant for unlawfully possessing a pistol. A search incident to the arrest revealed substantial quantities of heroin on the defendant's person, a machete and a

second revolver hidden in the automobile. In rejecting the de-
fendant's contention that the officer's "stop and frisk" and the
initial seizure of his pistol, upon which rested the later search
and seizure of other weapons and narcotics, was illegal, Mr.
Justice Rehnquist, delivering the opinion of the Court, said:

" . . . The Fourth Amendment does not require a police-
man who lacks the precise level of information necessary for
probable cause to arrest to simply shrug his shoulders and
allow a crime to occur or a criminal to escape. On the contrary,
*Terry* recognizes that it may be the essence of good police work
to adopt an intermediate response.

. . . .

"Applying these principles [*Terry v. Ohio*] to the present
case, we believe that Sgt. Connolly acted justifiably in respond-
ing to his informant's tip. The informant was known to him
personally and had provided him with information in the
past. . . . Thus, while the Court's decisions indicate that this
informant's unverified tip may have been insufficient for a
narcotics arrest or search warrant, see, e.g., *Spinelli v. United
States,* 393 U.S. 410, 21 L.Ed. 2d 637, 89 S.Ct. 584 (1969) ; *Agui-
lar v. Texas,* 378 U.S. 108, 12 L.Ed. 2d 723, 84 S.Ct. 1509
(1964), the information carried enough indicia of reliability to
justify the officer's forcible stop of Williams.

"In reaching this conclusion we reject respondent's argu-
ment that reasonable cause for a stop and frisk can only be
based on the officer's personal observation, rather than on
information supplied by another person. . . .

"While properly investigating the activity of a person who
was reported to be carrying narcotics and a concealed weapon
. . . Sgt. Connolly had ample reason to fear for his safety. . . .
Under these circumstances the policeman's action in reaching
to the spot where the gun was thought to be hidden constituted
a limited intrusion designed to insure his safety, and we con-
clude that it was reasonable. . . . The loaded gun seized as a
result of this intrusion was therefore admissible at Williams'
trial. *Terry v. Ohio,* 392 U.S., at 30, 20 L.Ed. 2d at 911.

"Once Sgt. Connolly had found the gun precisely where
the informant had predicted, probable cause existed to arrest
Williams for unlawful possession of the weapon." *Adams v.
Williams, supra* at 145-48, 32 L.Ed. 2d 616-18, 92 S.Ct. 1923-24.

The principles enunciated in *Terry v. Ohio* and *Adams v. Williams* have been applied often. For example in *United States v. Jefferson*, 480 F. 2d 1004 (4th Cir. 1973), *cert. denied*, 414 U.S. 1001, 38 L.Ed. 2d 236, 94 S.Ct. 354 (1973), the Fourth Circuit affirmed the defendant's conviction of illegal possession of a firearm. The evidence showed that sometime before his arrest, the police had received information from a reliable informant that the defendant was carrying a concealed weapon in a shoulder holster. This information was conveyed to other police officers and subsequently two officers effected a stop of the car by use of a warning siren and flashing lights. As they approached the car, the officers observed that the defendant removed a pistol from his waistline. The officers then placed the defendant under arrest. The Fourth Circuit affirming the conviction said:

"At the time the two officers stopped Jefferson their avowed purpose was not to make an arrest but to question him concerning the tip Powell had received. The Supreme Court recognized in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 2d 889 (1968), that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' 392 U.S. at 22. [Cites omitted.]

"The investigatory stop executed in the present case constituted a seizure of Jefferson's person, *United States v. Jackson*, 448 F. 2d 963 (9th Cir. 1971), and to be valid must have satisfied the reasonableness requirement of the fourth amendment. *Terry v. Ohio, supra.* In *Terry* the Supreme Court enunciated a standard for evaluating the reasonableness of a police officer's action in effecting a personal seizure which falls short of an arrest, that is '[W]ould the facts available to the officer at the moment of the seizure . . . "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' 392 U.S. at 21-22, 88 S.Ct. at 1880.

"Applying this standard in the present case we conclude that the information supplied by an informant whose tips had been found by [Officer] Powell to have been reliable in previous cases was sufficient to justify the officers' subsequent investigatory stop of Jefferson's vehicle." *United States v. Jefferson* at 1005-06.

State v. McZorn

The "stop and frisk" doctrine has also been applied in this State. *See State v. Streeter,* 283 N.C. 203, 195 S.E. 2d 502 (1973) ; *State v. Stanfield,* 19 N.C. App. 622, 199 S.E. 2d 741 (1973), *appeal dismissed,* 284 N.C. 622, 201 S.E. 2d 692 (1974). These principles must be applied to the facts of the present case.

The State's evidence on *voir dire* showed that within the hour prior to the time Watkins stopped defendant's car he had received information from a known informant of proven reliability that defendant was then at a certain "beer joint" in an area of West Southern Pines where he was accustomed to frequent several bars; that defendant was driving a '74 green Chevrolet Vega; and that defendant had on his person the .38 revolver which had been used to kill Mr. McAskill. As Deputy Watkins was cruising the area where defendant was reported to be, he encountered defendant coming toward him in his car. The deputy effected a stop by use of his siren and lights, approached the car, and identified himself to defendant. After asking defendant to get out of his car, the deputy frisked him, and found a fully loaded .38 caliber revolver in his inside pocket. At that point Deputy Watkins placed defendant under arrest for carrying a concealed weapon. All the evidence shows that defendant was initially arrested for carrying a concealed weapon and that he was subsequently charged with murder and armed robbery.

Defendant concedes in his brief "that the evidence on *voir dire* is sufficient to support the court's findings that Deputy Sheriff Watkins was justified in relying upon the information given him by a confidential informer." Although the officer *may* not have had probable cause on the basis of the informant's tip to arrest defendant for carrying a concealed weapon when he initially stopped defendant's car, see, e.g. *Spinelli v. United States,* 393 U.S. 410, 21 L.Ed. 2d 637, 89 S.Ct. 584 (1969) ; *Aguilar v. Texas,* 378 U.S. 108, 12 L.Ed. 2d 723, 84 S.Ct. 1509 (1964) ; *State v. Edwards,* 286 N.C. 162, 209 S.E. 2d 758 (1974) ; *State v. Ketchie,* 286 N.C. 387, 211 S.E. 2d 207 (1975), we conclude that the informant's tip carried sufficient "indicia of reliability" to justify the officer's stop of defendant's car. *See Johnson v. Wright, supra; United States v. Jefferson, supra.*

Having concluded that the circumstances justified Watkins in forcibly stopping defendant's vehicle to investigate the mur-

der of Mr. McAskill, we must determine whether the subsequent frisk was also permissible. In *Adams,* the Court quoting *Terry,* said: " 'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officers or to others,' he may conduct a limited protective search for concealed weapons. 392 U.S. at 24, 20 L.Ed. 2d at 908." *Adams v. Williams, supra* at 146, 32 L.Ed. 2d 617, 92 S.Ct. 1923. The officer need not be absolutely certain that the individual is armed. It is enough if a reasonably prudent man in the circumstances would be justified in concluding that the suspect was armed and dangerous.

Applying the *Terry-Adams* standards to this case, we conclude that Watkins, as a man of reasonable caution, after receiving the informant's tip, was warranted in the belief that defendant was armed with a weapon which could and would be fatally used against him and his companion, Agent Dowdy. The reasonableness and validity of this belief was demonstrated by defendant's remark that had he known the purpose for which the officers had stopped him, he would have killed them before permitting them to take him alive. Clearly the frisk was fully justified.

As soon as the frisk revealed that defendant was carrying a revolver, the officer had probable cause to arrest him for carrying a concealed weapon in violation of G.S. 14-269. Indeed, at that point, the officer had absolute knowledge that defendant was violating the statute and that he was committing a misdemeanor in his presence. Thus, defendant's arrest for carrying a concealed weapon was not in violation of his constitutional rights, and Watkins did not exceed his authority under our State law to arrest without a warrant. G.S. 15-41(1), which was in effect on 18 January 1975 but was superseded by G.S. 15A-401(b) on 1 July 1975, authorized any peace officer to arrest without a warrant any person who had committed a misdemeanor in his presence or whom he had "reasonable ground" to believe had committed a misdemeanor in his presence.

We hold therefore that defendant's warrantless arrest was neither unconstitutional nor violative of State statute and that the pistol, Exhibit 5, was properly admitted in evidence. We note, however, that since the arrest was constitutionally permissible mere statutory illegality would not have rendered

the weapon inadmissible in this case. *State v. Eubanks,* 283 N.C. 556, 196 S.E. 2d 706 (1973). (For arrests made since 1 July 1975 see G.S. 15A-974.)

Appellant's next assignment of error challenges the admissibility of his in-custody statement. As detailed in the preliminary statement, immediately after defendant was taken to the police station the officers told him they wanted to talk with him about the McAskill robbery and murder, and he was given the Miranda warnings. He said he understood them and was ready to talk with the officers then. At that point the officers asked him certain background questions, unrelated to the robbery and murder, and the record indicates he answered fully and truthfully. However, when he first gave an answer the officers knew to be false, Agent Dowdy immediately told defendant all the facts which their investigation of the crime had revealed and advised him that tests would be made to ascertain whether the bullet removed from Mr. McAskill's body had been fired from defendant's gun. Defendant then said he did not wish to say anything else at that point. The interrogation ceased and Dowdy left the room.

Approximately 20-30 minutes later Dowdy returned, and Deputy Watkins read to defendant the warrant charging him with the murder of Mr. McAskill. Dowdy then asked defendant if he could do anything for him, and defendant requested him to inform his parents, his brother and his girl friend of his situation and to get him some cherry Lifesavers (candy). Dowdy told him he would do as requested. At that point, no further questions having been put to him, defendant said, "I might as well tell you about it . . . I shot McAskill." Agent Dowdy then requested that he "explain what happened," and defendant responded with a detailed statement.

[2] Defendant now contends that Dowdy's request that he explain his volunteered statement that he killed Mr. McAskill was police interrogation and that his confession was not admissible because Agent Dowdy failed to repeat the *Miranda* warnings when he came back into the room after his 20-30 minute absence.

In our view, defendant's explanation of what happened was a voluntary, spontaneous statement not made in response to police interrogation, and further warnings were not required. In *Miranda* itself the Supreme Court said: "Volunteered statements of any kind are not barred by the Fifth Amendment and

their admissibility is not affected by our holding today." *Miranda v. Arizona,* 384 U.S. 436, 478, 16 L.Ed. 2d 694, 726, 86 S.Ct. 1602, 1630 (1966). Defendant's statement, "I may as well tell you what happened . . . I shot McAskill," was volunteered after all police interrogation had ceased and after he had been officially charged with Mr. McAskill's murder. The fact that Agent Dowdy asked defendant to explain what happened did not convert the conversation into an "interrogation."

As we said in *State v. Haddock,* 281 N.C. 675, 682, 190 S.E. 2d 208, 212 (1972), "[A] voluntary in-custody statement does not become the product of an 'in-custody interrogation' simply because an officer, in the course of appellant's narration, asks defendant to explain or clarify something he has already said voluntarily." Since there is no evidence here that defendant's statements were made in response to overbearing police questioning or other police procedures designed to elicit a statement, we conclude that they were the product of free choice and without the slightest compulsion of in-custody interrogation procedures. Therefore they were properly admissible. *See Holloway v. U. S.* 495 F. 2d 835 (10th Cir. 1974) ; *State v. Thomas,* 284 N.C. 212, 200 S.E. 2d 3 (1973), and cases cited therein; *State v. Blackmon,* 284 N.C. 1, 199 S.E. 2d 431 (1973).

Even if we were to construe as police interrogation Agent Dowdy's request that defendant "explain what happened" after he had confessed he killed McAskkill we would nonetheless conclude, under the circumstances of this case, that it was unnecessary for Agent Dowdy to repeat the *Miranda* warnings either when he reentered the room or before he asked defendant to explain.

[3] Many courts have considered the question whether *Miranda* warnings must be repeated at subsequent interrogations when they have been properly given at the initial one. *See* Note, The Need to Repeat Miranda Warnings at Subsequent Interrogations, 12 Washburn Law Journal 222 (1973), where the cases are collected and analyzed. The consensus is that although *Miranda* warnings, once given, are not to be accorded "unlimited efficacy or perpetuity," where no inordinate time elapses between the interrogations, the subject matter of the questioning remains the same, and there is no evidence that in the interval between the two interrogations anything occurred to dilute the first warning, repetition of the warnings is not required. *United States v. Hopkins,* 433 F. 2d 1041 (5th Cir.

1970) ; *State v. Sears,* 298 So. 2d 814 (La. 1974). However, the need for a second warning is to be determined by the "totality of the circumstances" in each case. *Commonwealth v. Ferguson,* 444 Pa. 478, 282 A. 2d 378 (1971). "[T]he ultimate question is: Did the defendant, with full knowledge of his legal rights, knowingly and intentionally relinquish them?" *Miller v. United States,* 396 F. 2d 492, 496 (8th Cir. 1968), *cert. denied,* 393 U.S. 1031, 21 L.Ed. 2d 574, 89 S.Ct. 643 (1969) ; *Brown v. State,* 6 Md. App. 564, 252 A. 2d 272 (1969).

[4]   Courts have included the following factors, among others, in the totality of circumstances which determine whether the initial warnings have become so stale and remote that there is a substantial possibility the individual was unaware of his constitutional rights at the time of the subsequent interrogation: (1) the length of time between the giving of the first warnings and the subsequent interrogation. *See State v. Gilreath,* 107 Ariz. 318, 487 P. 2d 385 (1971) (second and third interrogations occurred 12 and 36 hours respectively after the first; repeated warnings not required) (applying *Escobedo* principles) ; *Watson v. State,* 227 Ga. 698, 182 S.E. 2d 446 (1971) (7 hour interval held not to require repeated warning) ; *People v. Hill,* 39 Ill. 2d 125, 233 N.E. 2d 367 (1968) ; *Commonwealth v. Clark,* 454 Pa. 329, 311 A. 2d 910 (1973) (less than an hour) ; *Commonwealth v. Bennett,* 445 Pa. 8, 282 A. 2d 276 (1971) (five hours) (applying *Escobedo* principles) ; 12 Washburn Law Journal 222, 226; (2) whether the warnings and the subsequent interrogation were given in the same or different places, *United States v. Hopkins,* 433 F. 2d 1041 (5th cir. 1970) ; *Brown v. State,* 6 Md. App. 564, 252 A. 2d 272 (1969) ; (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers, *Id;* (4) the extent to which the subsequent statement differed from any previous statements; *Brown v. State, supra;* (5) the apparent intellectual and emotional state of the suspect. *State v. Magee,* 52 N.J. 352, 245 A. 2d 339 (1968), *cert. denied,* 393 U.S. 1097, 21 L.Ed. 2d 789, 89 S.Ct. 891 (1969).

[5]   In the present case the subsequent "interrogation" occurred only 20-30 minutes after the initial interrogation terminated. It was conducted in the same room and by the same officer who gave the initial warnings. Furthermore, the confession is not inconsistent with any earlier statements by the appellant. During the first interrogation he said merely that

he did not wish to talk about the murder at that time. In addition, there is no indication that defendant was so intellectually deficient or emotionally unstable that he had forgotten his constitutional rights that had been fully explained to him a short time earlier. Clearly, defendant's statements were not rendered inadmissible by the failure of the officer to repeat the *Miranda* warnings.

[6] Here we note the oblique suggestion in defendant's brief that the failure of the officers themselves to notify the 24-year-old defendant's parents, brother, and girl friend that he was in custody before they began to interrogate him "violated the spirit if not the letter of the law laid down in Miranda."

Defendant did not make this contention in the trial court and, on appeal, we find in the record nothing whatever to indicate that defendant's statement was coerced in any way or that his decision "to tell the officers about it" was induced or influenced in any degree by the fact that his family and girl friend had not been notified of his situation. On the contrary, all the evidence, including defendant's own testimony on *voir dire,* clearly and convincingly supports the judge's finding that the statement which defendant volunteered was freely and understandingly made. The clear implication is that, within one hour after he was taken into custody, defendant had realized the officers had the evidence of his guilt and it was futile to deny it further.

[7] Defendant's final assignment of error raises the question whether, upon the facts of this case and the charge of the court, he can be sentenced for both the murder of Mr. McAskill and the armed robbery of Kenneth.

The State prosecuted defendant for first degree murder on the theory that he killed Mr. McAskill while engaged in the perpetration of the felony of armed robbery. Where a homicide is committed in the commission of, or in the attempt to commit, an armed robbery, the State is not required to prove premeditation and deliberation; G.S. 14-17 pronounces it murder in the first degree. *State v. Bunton,* 247 N.C. 510, 101 S.E. 2d 454 (1958).

The evidence tended to show that when defendant and his companion entered the McAskill store defendant, who had a revolver, said to Kenneth, "This is a hold up; give me your money." Kenneth handed him his wallet containing $15.00 and, at

that point, Mr. McAskill, who had been dozing in his chair, "raised up." Defendant told his companion "to get him," but when the companion did nothing, defendant shot. Mr. McAskill fell to the floor, and the two men fled with Kenneth's money.

The judge charged the jury that in order to convict defendant of first degree murder, "the State must prove beyond a reasonable doubt, first, that the defendant committed murder by committing, or attempting to commit, the act of armed robbery and, second, that the defendant, while committing the act of armed robbery, proximately caused John Henry McAskill's death." The jury returned verdicts that defendant was guilty of the armed robbery of Kenneth McAskill and the first degree murder of John Henry McAskill.

Defendant contends the evidence shows that he attempted to commit, and committed, only one armed robbery—the robbery of Kenneth. He argues further that, under the court's charge, his conviction of felony-murder could only have been based on the jury's finding that he killed Mr. McAskill in perpetrating this armed robbery. Therefore, since the armed robbery was used to prove an essential element of the charge of murder in the first degree, defendant asserts he cannot be sentenced for the robbery. The authorities support this contention, and defendant's third assignment of error is sustained. *State v. McLaughlin,* 286 N.C. 597, 213 S.E. 2d 238 (1975). *See State v. Carroll,* 282 N.C. 326, 193 S.E. 2d 85 (1972) ; *State v. Peele,* 281 N.C. 253, 188 S.E. 2d 326 (1972) ; *State v. Thompson,* 280 N.C. 202, 185 S.E. 2d 666 (1972). Compare *State v. Alexander,* 284 N.C. 87, 199 S.E. 2d 450 (1973), *cert. denied,* 415 U.S. 927, 39 L.Ed. 2d 484, 94 S.Ct. 1434 (1974).

As to the charge of armed robbery,

Judgment arrested.

As to the murder charge,

No error.