STATE OF NORTH CAROLINA v. LEWIS ALEXANDER GARRISON

No. 70

(Filed 24 January 1978)

**1. Criminal Law § 75.8— Miranda warnings—resumption of interrogation—repetition of warnings not required**

It was not necessary for an officer again to give the *Miranda* warnings to defendant before questioning defendant in the bay area of the sheriff's office while on the way to the interrogation room, and statements made by defendant in the bay area did not taint defendant's subsequent written confession made in the interrogation room after the *Miranda* warnings were repeated to him, where the *Miranda* warnings had been given to defendant by the officer at the home of defendant's mother-in-law less than one hour and 15 minutes before defendant made the statements in the bay area, all interrogations were conducted by or in the presence of the same officer, the resulting statements were not fundamentally contradictory, during all the questioning defendant was calm and in full possession of all his faculties, defendant could read and write, and defendant was experienced in dealing with law enforcement officers.

**2. Criminal Law § 86.1— impeachment of defendant—prior convictions or conduct**

On cross-examination, for the purpose of impeachment, the district attorney may question a defendant who elects to testify in his own behalf with reference to specific acts of criminal and degrading conduct, provided the questions are based on information and asked in good faith.

**3. Criminal Law § 86.3— denial of conviction or conduct—further cross-examination—sifting the witness**

While the State is bound by a witness's denial of a conviction or of specific degrading conduct to the extent that it cannot be contradicted by other evidence, such denial does not per se preclude further cross-examination with reference to these matters, but it is for the trial judge to say how far the

State v. Garrison

State may go in "sifting" the witness who denies the commission of the acts about which he is cross-examined.

4. **Criminal Law § 86.3— denial of criminal conduct—further cross-examination—motion for mistrial**

In a burglary prosecution in which defendant denied on cross-examination that he had broken into an automobile and stolen a CB radio, the trial court did not err in the denial of defendant's motion for mistrial when the district attorney then asked defendant whether he had told officers where he had sold the radio and the court sustained defendant's objection to the question, since the record is devoid of any suggestion that the district attorney's questions were asked in bad faith, and *prima facie* the cross-examination was proper.

5. **Burglary and Unlawful Breakings § 7— burglary—time of intrusion into house—no conflict in evidence—submission of felonious breaking or entering not required**

In this first degree burglary prosecution, there was no conflict in the evidence with reference to the time of defendant's intrusion into the victim's house which required the submission of nonburglarious or felonious breaking or entering, all of the evidence having tended to show that defendant entered the house during the nighttime.

APPEAL by defendant under G.S. 7A-27(a) from *Donald L. Smith, S. J.,* 28 March 1977 Criminal Session of UNION.

Defendant was tried upon an indictment which charged that on 1 March 1977, in the nighttime between the hours of 9:00 and 10:00 p.m., with the intent to commit the felony of larceny therein, he did feloniously and burglariously break and enter the dwelling of Zeb W. Griffin, which was then occupied by Mrs. Zeb Griffin. The State's evidence tended to show:

On the night of 1 March 1977 Mrs. Zeb W. Griffin, who was then alone in her home in Union County, retired between 9:00 and 9:30 p.m. Before retiring she had ascertained that all doors were locked and the windows, none of which were broken, were closed. Later, when she was awakened by the sound of someone walking around in the house, she assumed that her husband, who had been in Charlotte that day, had returned home. She got up and went out into the hall. There she saw a tall, thin black man wearing a two-toned toboggan and shaded glasses; she had never seen this individual before. They looked at each other, and he darted into the other bedroom. She ran back into her room and pulled the sewing machine across the door. Sometime later, having heard no further noises, she peered out her door and saw the man's head "sticking out the other bedroom door." Upon seeing her he shut

the door. Soon thereafter she heard the telephone ring in the kitchen. Then she heard the intruder run by the hall door and leave the house by the back way.

After the man had left the house Mrs. Griffin answered the telephone. A voice, which "sounded like a colored person," asked to speak to Toby. She responded "that Toby didn't live there and they had the wrong number." She then called her son. Upon her son's arrival he called the sheriff's office and Deputy Sheriff Cook came to the Griffin residence.

After hearing Mrs. Griffin's account of the events summarized above, he inspected the premises. He found that a back window had been broken out and the metal frame "tore up pretty good." A heavy flat file with a wooden handle on the end, which he found on the windowsill, had apparently been used to knock out the window.

Mrs. Griffin testified that after the break-in several items were missing from the dresser in "the other bedroom": a change purse containing more than $16.00, a flashlight, her rings, and two watches. Later in the evening Deputy Sheriff Cook returned to the Griffin home with Mrs. Griffin's rings and the two watches.

After conducting a *voir dire*, the court found facts and permitted Officer Cook to give the testimony summarized below. His testimony before the jury included the substance of his testimony on *voir dire*.

Cook had known defendant prior to 1 March 1977. On that day he first saw defendant about 10:30 or 11:00 p.m. at the home of defendant's mother-in-law, Mrs. Duncan. Defendant appeared normal in all respects and he talked coherently and intelligently. At Cook's request defendant accompanied him outside. At this time defendant was not under arrest, and before asking him any questions, Cook orally advised him of his constitutional rights. Thereafter defendant agreed to talk to him and said "he didn't want a lawyer because he hadn't done anything." Cook then questioned him about "this crime which had occurred" at the Griffin residence. In response to questions as to his whereabouts that night defendant told Cook he had been down to the phone booth at Yank's Grill, a place within two blocks of the Griffin home. Cook then talked further with Mrs. Duncan. Thereafter he told defendant that he would like to talk to him at the sheriff's office,

and defendant said he was willing to go. At the sheriff's office Deputy Sheriff Cook awaited the arrival of Sheriff Fowler. About 11:45 p.m., in the presence of Sheriff Fowler, Cook again warned defendant of his rights. This time he gave defendant a copy of the *Miranda* warning which defendant followed as Cook read it aloud to him. Defendant then said he understood his rights and that he desired to answer the officer's questions. He signed the warning and waiver of rights (State's Exhibit 3).

After defendant and Cook had talked 15 or 20 minutes defendant made a statement which Cook reduced to writing. Cook testified, "I would ask him and he would tell me and I would write it down." The entire interrogation lasted about one hour. At no time was defendant threatened; nor was he offered any reward or hope of reward to induce a statement. He answered questions and never indicated any desire to end the interrogation. After writing the statement (State's Exhibit 4) Cook read it back to defendant, who then read it himself. He pronounced it correct and signed it. The statement is summarized below. After acknowledging that he was not under the influence of alcohol or drugs; that he made "this statement freely and willingly without any threats or promises from anyone," and that he had been "advised of his rights," defendant stated:

About 9:00 p.m. on 1 March 1977 he went to the back of the Griffin home. He found he could get into the house and he entered. Inside, he used the phone to call his sister's home and leave word for her to call him at the Griffin's number. When she called a short time later, Mrs. Griffin got up, answered the phone, and told his sister she must have the wrong number. At this time defendant was in the next bedroom looking out the door. When Mrs. Griffin saw him he shut the door and held it until she went back into her bedroom. He then left the house, taking with him from the bedroom a change purse, a flashlight, two rings and two ladies' watches. He returned to Mrs. Duncan's home, about half of a mile from the Griffin residence, arriving about 10:30 p.m.

Cook testified that defendant at first had told him "he had lost the stuff out of his pocket when he was running back home." However, he later told Cook "that he had dropped the flashlight and the merchandise in a box there in his wife's bedroom at his mother-in-law's house."

Defendant's evidence consisted of his own testimony and that of his wife.

Defendant testified on *voir dire* that he had an eleventh grade education and could read and write; that in March 1977 he was 22 years old; and that on the night of 1 March 1977 Officer Cook came to his mother-in-law's home, which was about a mile or a mile and a half from the Griffin residence. Cook asked him to go downtown with him, and he went. At the sheriff's office Cook advised him of his rights for the first time. On previous occasions defendant had "been advised of those same rights by other officers," and he knew Officer Cook was then questioning him "about a crime that had been committed." He told Cook he was not going to answer anythig until he got a lawyer, but they had a little argument and he "went ahead and gave it to him." The officer wrote out the statement (State's Exhibit 4), read it aloud to him and he signed it. He also read it after he signed it. Nobody hit him but he was scared. He had not been drinking, taking pills, or smoking marijuana. On *voir dire*, defendant said, "It was about thirty minutes since I had been in Mr. and Mrs. Griffin's house that the officers came to my mother-in-law's and wanted to talk to me. . . . I was under arrest after the interview."

Defendant's testimony before the jury, summarized except when quoted, tended to show:

On the night of 1 March 1977 his wife was having labor pains and he thought it was time for her to go to the hospital. He left his mother-in-law's home about 7:00 or 7:30 p.m. and went to Yank's Grill "to make a phone call for his wife." At the grill he discovered that he did not have the 20 cents required to make a call. Unable to find anybody there to take his wife to the doctor, defendant knocked on the door of the Griffin house, the only house in which he saw a light. When no one answered his knock he decided nobody was at home. He then entered through a broken window and called his sister's home on a phone he found in the kitchen. His sister was out; so he gave her daughter the Griffin's number and told her to have his sister call him upon her return. For about 20 minutes thereafter he walked around in the house. Then the telephone rang, but before he could answer it Mrs. Griffin came out of her room. When she saw defendant she ran back into her room, and he ran into the other one. Thinking that she might be going for a gun, he decided he "wasn't going to

stick around to talk to her" about why he was there but that he "was going on back to his mother-in-law's house to see how [his] wife was doing." Accordingly, he left by the back door after having been in the house a total of approximately thirty minutes. Mrs. Duncan lived about a half a mile or a mile from the Griffin house. Defendant had been home about 20-25 minutes when the officers came and took him to the Sheriff's Department. The only statement he made to Officer Cook was that he went into the Griffin house to make an emergency phone call because his wife was sick and having labor pains.

On cross-examination defendant testified that when he climbed in the window of the Griffin house he "believed there was somebody in there"; that he had previously been tried and convicted of first-degree burglary, larceny, automobile larceny, and damaging personal property. He said he had signed State's Exhibit 4 because he "felt like signing it." He admitted he had told the officers he took two watches and two rings from the Griffin house but said he did so only "to get the officers off his back"; that all he took from the house was one flashlight.

Defendant's wife, whom he called as a witness, testified that he left home about 7:15 p.m. and returned about 10:30 p.m.; that on the night of 1 March 1977 she was not feeling well but she was not having any labor pains; that she did not go into labor that night, and that she was still carrying the child at the time of the trial.

The court charged the jury that, upon the evidence adduced, it might return one of three possible verdicts: guilty of burglary in the first degree, guilty of nonfelonious breaking or entering, or not guilty. The jury found defendant guilty of burglary in the first degree and, under G.S. 14-52 (N.C. Gen. Stats., 1975 Cum. Supp. to Vol. 1B), the court imposed the mandatory sentence of imprisonment for life in the State's prison.

Other facts pertinent to the assignments of error will be included in the opinion.

*Attorney General Rufus L. Edmisten and Charles J. Murray, Assistant Attorney General for the State.*

*Joe P. McCollum, Jr., for defendant appellant.*

SHARP, Chief Justice.

[1]  Defendant brings forward three assignments of error. The first is that the court erred in admitting into evidence defendant's "alleged confession."

Upon defendant's objection to the admission in evidence of "any statement of the defendant," Judge Smith conducted a *voir dire* to determine the circumstances under which any statements by defendant were made. After hearing the testimony of both Officer Cook and defendant, Judge Smith found the circumstances to have been as testified to by Cook. In addition, he found that on the night in question defendant was not under the influence of alcohol or drugs and that he was fully able to read and write.

Based on the foregoing findings the judge held that defendant had "freely, intelligently, voluntarily and understandingly" twice waived his right to counsel—verbally at the home of Mrs. Duncan and in writing at approximately 11:45 p.m. at the sheriff's office. Judge Smith thereafter found that neither waiver was the result of any promise of reward, pressure, threat or coercion and that both waivers were constitutionally obtained and valid in all respects. He therefore adjudged "that any statement made by defendant on the night of March 1st, 1977, or the early morning of March 2nd, 1977," would be admitted in evidence "if the same is otherwise admissible."

Defendant excepted to this order but thereafter made no objection to the admission of any statement, oral or written, which defendant had made.

Cook's testimony, heretofore detailed in our preliminary statement of facts, was that on the night in question he first confronted defendant at Mrs. Duncan's home about 10:30 or 11:00 p.m. Before asking defendant any questions relating to the intrusion which had occurred earlier at the Griffin residence, Cook orally gave defendant the *Miranda* warning, and defendant orally waived both his right to counsel and his right to remain silent. Cook testified that after defendant told him "he had been down to the phone booth there at Yank's Grill, which is close to Mrs. Griffin," he requested defendant to accompany him to the sheriff's office. Defendant agreed to go and got dressed for that purpose.

It is not clear from the record whether Cook continued to interrogate defendant as he drove him to the sheriff's office.

However, Cook testified that as they entered "the bay" and were approaching "the interrogation part of the office," he asked defendant "about some stuff that was gone out of Mrs. Griffin's home." Defendant responded by telling him that he had taken some articles, including a change purse, but that he had lost them out of his pocket running home, stating approximately where he thought he had lost them.

At about 11:45 p.m. Cook, in the interrogation room in the presence of Sheriff Fowler, again warned defendant of his constitutional rights, and this time defendant executed a written waiver of his right to counsel and right to remain silent. Deputy Cook and Sheriff Fowler then talked to him approximately an hour, and thereafter defendant signed the statement introduced in evidence as State's Exhibit 4.

The court's findings, made at the conclusion of the *voir dire*, are clearly supported by plenary evidence. They are, therefore, conclusive on appeal. *State v. Roseman*, 279 N.C. 573, 184 S.E. 2d 289 (1971). Indeed, the findings are largely supported by defendant's own testimony. Although defendant made the general statement that he was "scared," he makes no contention that he was under the influence of drugs or alcohol; that he was threatened, coerced, promised leniency; or that he did not understand his rights. Moreover, he admitted that on previous occasions other officers had explained them to him, and that he signed Exhibit 4 because he "felt like signing it."

Appellant's contention, as stated in his brief, is "that the interrogation stopped at the mother-in-law's house and resumed in the bay of the office of the sheriff. That when the defendant made the statement in the bay 'that he had been in Mrs. Griffin's,' he was being interrogated by Sergeant Cook for the second time and had not been given his Miranda warnings. Therefore, the appellant argues that the written confession later given was tainted and should not have been allowed in evidence." This contention has no merit. As the court found, Officer Cook had fully warned defendant of all his constititional rights before he interrogated him at the home of his mother-in-law and the circumstances did not require a repetition of the warnings. *See State v. White*, 291 N.C. 118, 229 S.E. 2d 152 (1976); *State v. McZorn*, 288 N.C. 417, 219 S.E. 2d 201 (1975).

The "bay" interrogation occurred less than one hour and 15 minutes after the initial warning had been given. All interrogations throughout were conducted either by or in the presence of the same officer, Deputy Cook. Furthermore, the resulting statements, although dissimilar, were not fundamentally contradictory. Finally, during all the questioning, defendant was calm and in full possession of all his faculties; he could read and write; and he was experienced in dealing with law enforcement officers. By his own statement, he never drank alcoholic beverages and he was not under the influence of drugs. Applying to this situation the guidelines laid down in *State v. McZorn, supra,* Sheriff Cook's failure to repeat the *Miranda* warnings as he and defendant walked through the bay to the interrogation room at the sheriff's office did not render defendant's statements inadmissible. From the four corners of this record it is clear that all of defendant's statements were voluntarily and understandingly made after he had been fully and fairly warned of all of his constitutional rights.

[4] Defendant's second contention is that the trial court erred in disallowing his motion for a mistrial based upon the following occurrence:

On the cross-examination of defendant, after he had denied that on 21 February 1977 he had broken into an automobile belonging to Mr. Brooks and taken a CB radio, the district attorney said, "I'll ask you if you didn't tell the officers where you sold the radio?" Defendant's objection to the question was sustained and he did not answer the inquiry. Defendant moved for a mistrial, and the court correctly denied the motion.

[2, 3] On cross-examination, for the purpose of impeachment, the district attorney may question a defendant who elects to testify in his own behalf with reference to specific acts of criminal and degrading conduct, provided the questions are based on information and asked in good faith. *State v. Broom,* 222 N.C. 324, 22 S.E. 2d 926 (1942). Such cross-examination is not limited to conduct for which defendant has been convicted but encompasses any act of the witness which tends to impeach his character. *State v. McKenna,* 289 N.C. 668, 224 S.E. 2d 537 (1976); *State v. Gainey,* 280 N.C. 366, 185 S.E. 2d 874 (1972). "The rule is necessary to enable the State to sift the witness and impeach, if it can, the credibility of a defendant's self-serving testimony." *State v. Foster,* 284 N.C. 259, 275, 200 S.E. 2d 782, 794 (1973). It is for the

trial judge to say how far the State may go "in sifting" the witness who denies the commission of the acts about which he is cross-examined. The scope of such cross-examination is subject to his discretion. *State v. Williams*, 279 N.C. 663, 675, 185 S.E. 2d 174, 181 (1971). Of course, as in the case of other collateral facts, the State is bound by the witness's answers to the extent that they cannot be contradicted by other evidence. *State v. Broom*, *supra;* 1 Stansbury's North Carolina Evidence, § 111 (Brandis rev. 1973). Nevertheless, a witness's denial of a conviction or of specific degrading conduct does not per se preclude further cross-examination with reference to these matters. *State v. Gaiten*, 277 N.C. 236, 176 S.E. 2d 778 (1970); *State v. Robinson*, 272 N.C. 271, 158 S.E. 2d 23 (1967).

[4] The court in its discretion did not require defendant to answer the question whether he had told the officers where he sold the radio. The cross-examination was halted as soon as defendant had denied that he had broken into Mr. Brook's automobile and that he had taken therefrom a CB radio. Obviously, the district attorney's questions implied that he had information contrary to defendant's denials, but it is equally clear that the record is devoid of any suggestion that the questions were asked in bad faith. Prima facie, the cross-examination was proper. Certainly, on this record, it would be absurd to say that the district attorney's question, to which the court sustained defendant's objection, affected the outcome of the trial. Defendant's second assignment of error is overruled.

[5] Finally, defendant contends that because of conflicting evidence as to whether defendant's unauthorized entry into the Griffin residence was during the nighttime "the trial judge should have instructed the jury that they could return a verdict of felonious breaking and entering." This contention is futile for it is based upon a false premise.

It is quite true that to warrant a conviction of burglary the State must show that there was a breaking and entering during the nighttime of a dwelling or sleeping apartment with the intent to commit a felony therein. "The law considers it to be nighttime when it is so dark that a man's face cannot be identified except by artificial light or moonlight." *State v. Frank*, 284 N.C. 137, 145, 200 S.E. 2d 169, 175 (1973). However, the record contains no

State v. Garrison

evidence tending to show that defendant entered the Griffin house during the daytime.

The evidence for the State tended to show that defendant entered the Griffin dwelling after 9:00 p.m. Defendant's wife testified that he left Mrs. Duncan's home, where they were then living, at 7:15 p.m. and did not return until about 10:30 p.m. Defendant himself testified that he left his mother-in-law's home about 7:00 or 7:30 p.m.; that the Duncan home was from half a mile to a mile and a half from the Griffin house; that before going to the Griffin home he went to Yank's Grill, where he attempted unsuccessfully to make a phone call and to find somebody to take his wife to the doctor; that from there he went to the Griffin home and entered it because it was the only house in which he saw a light. Moreover, in the written statement which defendant signed he stated that he entered the Griffin home at "about 9:00 p.m." Further, we take judicial notice that in Union County on 1 March 1977 the sun set at 6:10 p.m. and that it was nighttime before 7:00 p.m. *See* the schedule for "Sunrise and Sunset" computed by the Nautical Almanac Office, United States Naval Observatory.

Thus, there existed no conflict in the evidence with reference to the time of defendant's intrusion into the Griffin house which required the submission of an issue of nonburglarious or felonious breaking or entering. *State v. Jones*, 291 N.C. 681, 231 S.E. 2d 252 (1977); *State v. Harvey*, 281 N.C. 1, 187 S.E. 2d 706 (1972). Here we note that, based on defendant's statement that he entered the Griffin home solely for the purpose of using the telephone, the court submitted the issue of defendant's guilt of nonfelonious breaking or entering. Notwithstanding, on the clear, strong, and convincing evidence the jury found defendant guilty of burglary in the first degree. In his trial, we find

No Error.