ROBERT LEE WILLIAMS, a/k/a JOHN ANTHONY MEANS *v.* STATE OF MARYLAND

[No. 425, September Term, 1968.]

*Decided June 6, 1969.*

The cause was argued before MURPHY, C.J., and AN-
DERSON, MORTON, ORTH, and THOMPSON, JJ.

*Samuel A. Tucker* for appellant.

*James L. Bundy, Assistant Attorney General,* with
whom were *Francis B. Burch, Attorney General, Charles
E. Moylan, Jr., State's Attorney for Baltimore City,* and
*Howard L. Cardin, Assistant State's Attorney for Bal-
timore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The appellant, tried on 7 and 8 October 1968 at a court
trial in the Criminal Court of Baltimore under an in-
dictment charging that on 16 June 1963 he did assault
with intent to murder John Nolan and did assault and
beat the same person, was found guilty generally and a
general sentence of 15 years from 15 June 1963 was im-
posed.[1] On appeal he claims only that the trial court erred

---

1. Apparently the appellant had been previously tried and con-
victed of the crimes and elected to void the original indictment
under the decision in *Schowgurow v. State,* 240 Md. 121. At ar-
raignment defense counsel said that he represented the appellant
"in his motion for a new trial after the original conviction, also
to the Court of Appeals, then Schowgurow, and also for the pro-
vision with the remand."
The appellant presents no question of merger of offenses.

in denying his motion to suppress evidence seized from his person.

At the time of the commission of the crimes in 1963 John Nolan was an officer of the Baltimore City Police Department working the midnight to 8:00 A.M. shift in the Eastern District. Before going on duty on 16 June a description of an automobile was given at roll call. While driving his own car to his post, which was Monument Street to Eager Street and from Wolfe Street to Patterson Park, he observed, on the left-hand side of the 800 block Chester Street, an automobile "with three suspects in it" answering the description of the one given at roll call. As he pulled behind the automobile it drove away and he followed it to the 3100 block of Federal Street where it pulled to the curb and stopped. He was in uniform and getting out of his car, approached the automobile, asking the driver for his license and registration. There was a flash and "I realized I was hit in the right shoulder. At that time, the two other suspects who were on the right-hand side of the automobile had gotten out of the automobile and were facing over the roof on the other side, and I noticed another flash." He returned the fire, emptying his revolver, and reloaded. During the time he was being fired upon, "at least four shots" were fired at him. The man who had gotten out of the driver's side and one of those on the other side of the car were firing the shots. A cruising patrol came up and Nolan cried out, "Call an ambulance, I have been shot" and warned, "Don't get out of the automobile." From that point on no more shots were fired. He was taken to the hospital, the bullet was removed and he remained in the hospital about three weeks. The bullet taken from his shoulder was entered into evidence without objection. He could not identify any of the men but one of them was wearing what he believed was a light colored T-shirt.

Officer Nicholas Palmere, assigned to the Eastern District at the time, was also working the midnight to 8:00 A.M. shift on 16 June. About 12:35 A.M. "a call came over the air for an 'assist an officer' in the 3100 block of

Federal Street, a police officer was shot. In responding to the scene in company with my partner (Officer Anthony E. Filipiak) I observed Officer Nolan who was holding his shoulder, and he stated to me that he had been shot * * * and he advised it was three men that did it, and a partial description was put over the air and several cars responded. We left the scene and immediately searched the neighborhood." Before he left the scene he saw a station wagon with two bullet holes in the windshield. He drove east on "Federal Street, Edison Highway, and then circled the block. And we were going west in about the 2900 block of Preston Street when some lady, I don't know who she is, called our attention and stated to us out of a clear blue sky, 'Officer, the man you want just ran down the street,' * * * indicating south across Preston Street, toward Biddle Street, going up—going up the alley * * * We went up, circled the block, and then, while going west, also on Biddle Street, when near the vicinity of Linwood Avenue, I observed a man walking or coming across from the north side to the south side on a diagonal as he walked. And, as we approached up to him, he sort of turned around, and then started walking to the opposite direction away from us * * * He made an indication, as he turned halfway towards us, and then started to walk away from us as we were traveling * * * Officer Potyraj, who was in another vehicle, came out of Linwood Avenue and pulled in front of the man we were watching. And as we pulled up right behind him, Officer Potyraj was out of the car going towards the man. I noticed, as the man sort of turned to his left, he had a bulge in his right pocket, pants pocket, and he started to put his hand in there. And I was coming up to him, and Officer Potyraj said, 'Keep your hands out of your pocket,' and he (the man) put his hand in his pocket [2] * * * and Officer Potyraj grabbed for him and told him to keep his hands out of his pocket. As I came up, he had his hand in his * * * left pocket—and Officer

---

2. At this point the witness corrected his testimony, stating that the bulge was in the left pants pocket.

Potyraj had his hand on the outside of the left pocket, and stated to me 'It's a gun in there,' and I grabbed his left arm and pulled it out. In doing so, Officer Potyraj removed a pistol from his pocket." The man apprehended was identified by Palmere as the appellant. The apprehension took place about "four; four and a half blocks" from the scene of the shooting. Palmere said that when the call came in "we responded figuring if anybody were to run that way, they would either run south or run west from the scene, because they couldn't run north, because they would run right into the Station House," which was about a block from the scene. The appellant was apprehended within ten to twenty minutes from the time Palmere arrived at the scene of the shooting. "The only other person (other than the woman) I ever seen on the street was the man we had arrested, plus another officer who was at the scene * * * [W]e were noticing both sides of the street seeing if anybody was running or anybody that looked like any description other than what we had, and the only person that we seen on Biddle Street was the person that we arrested * * * I could see that the man was sweating, so he must have been running." It was also elicited that the appellant had an object under his arm when first observed walking toward the officer and when he turned and walked away, "that's when he dropped this thing that was under his arm." It was an overcoat. The appellant told the police his name was Means.

Officer Anthony E. Filipiak's testimony was substantially the same as that of Palmere. He elaborated on what the woman said to them. While they were cruising around Preston Street and Elwood Avenue after receiving information about the shooting, "a colored woman waved us down, and she hollered, 'Officer, officer,' she says, 'There's a lot of police cars went through here, apparently looking for someone. I think the man you are looking for just run west on Preston and down on Potomac Street.' " He recounted observing the appellant, whom he identified, and described the appellant's actions. He heard

Potyraj say to Palmere, "Be careful, he has a gun." He identified the gun taken from the appellant. He said the arrest took place about ten minutes from the time they had received the information.

The appellant offered no evidence on the issue of the legality of the arrest.

The trial court reviewed the evidence and said, "I think you have got enough to justify probable cause, and I think you have got enough to justify the search and seizure, and I would so hold." But it thought "it falls more within the *Terry v. Ohio* case (392 U. S. 1)." After giving its reasons in detail why *Terry* was applicable, the trial court ruled that the gun was admissible and it was admitted in evidence.[3]

We think it abundantly clear that the search here was reasonable, at the least as a protective search authorized by *Terry*. It fell well within the "narrowly drawn authority permitting a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime * * * [A] reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." 392 U. S. 27. It was justified in its inception and was reasonably related in scope to the circumstances which justified the interference in the first place. 392 U. S. 19-20. The gun seized by the search was therefor properly introduced in evidence and there was no error in the denial of the motion to suppress the evidence.

*Judgment affirmed.*

---

3. A ballistics expert for the Maryland State Police testified that he made an examination of the bullet removed from the shoulder of Nolan and the revolver taken from the appellant. He fired a test bullet from the gun, "and under the comparison microscope, I matched the test bullet against (the bullet removed from Nolan's body) and determined that (the bullet removed from Nolan's body) did come from this weapon to the exclusion of all others."