STATE OF NORTH CAROLINA v. GEORGE STREETER

No. 22

(Filed 11 April 1973)

1. Arrest and Bail § 3— probable cause to arrest

An arrest is constitutionally valid when the officers have probable cause to make it; whether probable cause exists depends upon

State v. Streeter

whether at that moment the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent man in believing that the suspect has committed or is committing an offense.

2. Searches and Seizures § 1— search incident to arrest

When a person is lawfully arrested a search of his person may be made without a search warrant.

3. Arrest and Bail § 3; Criminal Law § 84; Searches and Seizures § 1— arrest without warrant — probable cause — search incident to arrest

Police officers had probable cause to believe that defendant was carrying a concealed weapon in their presence, and thus had authority to arrest defendant without a warrant, when the officers observed defendant walking beside a deserted street near a doctor's office and other business establishments at 2:45 a.m., the officers stopped to learn defendant's identity and destination, the officers observed defendant's shirttail hanging outside his trousers and a bulge under his shirt on the right side where a holster and revolver would ordinarily be located, and one officer touched the bulging object and it felt like metal; and when the officer, believing defendant possessed a gun, reached under defendant's shirttail and discovered burglary tools, such search was incident to a lawful arrest and the fruits of the search were lawfully admitted in evidence.

4. Searches and Seizures § 1— stop and frisk — absence of statute

The absence of a stop and frisk statute is not fatal to the authority of law enforcement officers in North Carolina to stop suspicious persons for questioning (field interrogation) and to search those persons for dangerous weapons (frisking), since those practices are valid under the common law.

5. Searches and Seizures § 1— authority of officer to stop and frisk

If the totality of circumstances affords an officer reasonable grounds to believe that criminal activity may be afoot, he may temporarily detain the suspect; if, after the detention, his personal observations confirm his apprehension that criminal activity may be afoot and indicate that the person may be armed, he may then frisk him as a matter of self protection.

6. Searches and Seizures § 1— limited weapons search — discovery of burglary tools

When law officers stopped to learn defendant's identity and his reason for being on a deserted street near a doctor's office and other business establishments at 2:45 a.m., and the officers saw a bulge protruding from beneath defendant's shirt which appeared to be a gun, it was reasonable by Fourth Amendment standards for the officers to conduct a limited protective search for weapons immediately, even if the officers had no probable cause to arrest defendant, and burglary tools necessarily exposed by the limited weapons search were lawfully obtained and are not excluded by either the Fourth Amendment or G.S. 15-27(a).

State v. Streeter

Justice SHARP concurs in result.

JUSTICE HIGGINS dissenting.

Chief Justice BOBBITT joins in the dissenting opinion.

DEFENDANT appeals from decision of the Court of Appeals, 17 N.C. App. 48, upholding judgment of *Rouse, J.,* 6 December 1971 Criminal Session, PITT Superior Court.

Defendant was charged in a bill of indictment, proper in form, with the felonious possession of implements of housebreaking, to wit: one pair of gloves, one flashlight, one hammer, one prybar, one screwdriver, and one green bag.

The State's evidence tends to show that while on routine patrol Sergeant David R. Bullock and Officer R. M. Nichols of the Greenville Police Department observed defendant walking beside North Carolina Highway No. 43 approximately four hundred feet from Dr. Graves' office at 2:45 a.m. on 26 October 1971. Defendant, whom the officers did not know, was wearing a long-sleeved blue shirt with the shirttail outside his trousers and hanging below his waist. In view of the hour and defendant's proximity to business offices, Sergeant Bullock stopped to learn defendant's identity and why he was in the area at that hour of the morning. He alighted from the police cruiser, approached defendant, who had stopped a short distance from the paved portion of the highway, and engaged him in conversation. While talking to him, Sergeant Bullock "saw something bulging from under his shirt" on the right side where a holster and revolver would ordinarily be located. The officer then told him "not to move," and, thinking the bulging object was a revolver, touched it. It felt like metal. Believing defendant possessed a gun, the officer reached under defendant's shirttail and found one pair of gloves, one screwdriver, one hammer, one prybar, a flashlight, and one green Wachovia money bag. The officers took possession of this assortment and placed defendant under arrest for possession of burglary tools.

Sergeant Bullock's testimony was admitted in evidence over defense objections following a voir dire examination and findings of fact by the trial judge. The items taken from defendant's person by the officer were also admitted into evidence over objection.

Defendant testified that he was walking along the side of the street when the police car stopped; that he then stopped

and the officers asked his name and where he was going and he told them; that when the officer got out of the car and walked around "to where I was he patted . . . my back pocket really and then he pulled out this screwdriver"; that he asked the officer if the search was legal and the officer said yes; that he obeyed instructions to put his hands up against the car at which time the officer searched him and removed the other articles.

On cross-examination defendant denied he was a dope addict but admitted that certain holes in his arm were needle marks. He said he had been hospitalized in the Veterans' Hospital in Salem, Virginia, for drug addiction and now receives medication from Dr. Best. When arrested, he asked the officers to call Dr. Best, and the doctor told the officers to take him to the hospital. He stated that he had not used unauthorized narcotics since August and was using legal narcotics prescribed by Dr. Best "while I am in jail." He asserted that on the night of his arrest he had been at home prior to 2:45 a.m. and arose at that hour of the morning to go to Samuel Dixon's house to meet with friends and do some carpentry work Mr. Dixon had requested him to do that night. He explained the tools under his shirt in the following language: "I had the objects underneath the shirt because I had on a shirt that has tails and when I am not wearing a coat I normally wear a shirt on the outside and I had the objects in my pocket. The shirt wasn't a means of concealing; just a way of wearing the shirt."

The jury convicted defendant of possession of burglary tools, a violation of G.S. 14-55, and he was sentenced to a prison term of not less than eighteen months nor more than six years. The Court of Appeals upheld the judgment and defendant appealed to the Supreme Court, allegedly as of right pursuant to G.S. 7A-30(1), asserting a violation of his Fourth Amendment rights against unlawful searches and seizures.

*Robert Morgan, Attorney General; Christine Y. Denson, Assistant Attorney General, for the State of North Carolina.*

*William E. Grantmyre, Attorney for defendant appellant.*

HUSKINS, Justice.

This case involves the admissibility of evidence obtained by officers as a result of defendant's on-the-street arrest and the

accompanying search of his person. Defendant contends his warrantless arrest was without probable cause, the search of his person illegal, and the fruits of the search inadmissible in evidence against him.

We first determine whether the facts afforded the officers probable cause to arrest defendant and whether the search of his person was incident to that arrest.

"Probable cause for an arrest has been defined to be a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty. * * * To establish probable cause the evidence need not amount to proof of guilt, or even to prima facie evidence of guilt, but it must be such as would actuate a reasonable man acting in good faith." 5 Am. Jur. 2d *Arrests* § 44 (1962). "The existence of 'probable cause,' justifying an arrest without a warrant, is determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. It is a pragmatic question to be determined in each case in the light of the particular circumstances and the particular offense involved." 5 Am. Jur. 2d *Arrests* § 48. *Accord, Brinegar v. United States,* 338 U.S. 160, 93 L.Ed. 1879, 69 S.Ct. 1302 (1949) ; *State v. Roberts,* 276 N.C. 98, 171 S.E. 2d 440 (1970).

[1] An arrest is constitutionally valid when the officers have probable cause to make it. Whether probable cause exists depends upon "whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 13 L.Ed. 2d 142, 85 S.Ct. 223 (1964).

It is provided by statute that a peace officer may make an arrest without a warrant: "(1) When the person to be arrested has committed a felony or misdemeanor in the presence of the officer, or when the officer has reasonable ground to believe that the person to be arrested has committed a felony or misdemeanor in his presence; . . . " G.S. 15-41.

[2] When a person is lawfully arrested a search of his person may be made without a search warrant. "Unquestionably, when a person is lawfully arrested, the police have the right, without

a search warrant, to make a contemporaneous search of the person of the accused for weapons or for the fruits of or implements used to commit the crime." *Preston v. United States,* 376 U.S. 364, 11 L.Ed. 2d 777, 84 S.Ct. 881 (1964). *Accord, State v. Harris,* 279 N.C. 307, 182 S.E. 2d 364 (1971).

[3] What were the factual and practical grounds in this case which actuated Officers Bullock and Nichols to arrest defendant and search him? They may be enumerated as follows: (1) Defendant cast furtive glances toward the police car as it approached him; (2) the hour was 2:45 a.m., the streets of Greenville were deserted save for defendant alone, and he was walking or standing beside the road a few hundred feet from a doctor's office and other business establishments; (3) the officers did not recognize defendant but observed his shirttail outside his trousers and hanging below his waist; (4) the officers stopped to learn defendant's identity and make inquiry concerning his destination; (5) when Sergeant Bullock approached defendant and engaged him in conversation he "saw something bulging from under his shirt" on the right side where a holster and revolver would ordinarily be located; (6) thinking the bulging object was a revolver, the officer told defendant "not to move," touched the bulge and it felt like metal, and then reached under defendant's shirttail and discovered the burglary tools.

In our opinion these facts would actuate any reasonably prudent man acting in good faith to believe that defendant was carrying a concealed weapon in the presence of the officer, a violation of G.S. 14-269. Thus there was probable cause for the arrest which ensued.

Such probable cause arose when, in the nocturnal setting depicted by the evidence, Officer Bullock saw the bulge. Defendant was not under arrest prior to that time—no arrest was effected by merely stopping the police car beside defendant and getting out to talk to him. *Accord, Knight v. State,* 502 P. 2d 347 (Okla. Crim. App. 1972). "No one is protected by the Constitution against the mere approach of police officers in a public place." *United States v. Hill,* 340 F. Supp. 344 (E.D. Pa. 1972). Nor is there anything in the Constitution which prevents a policeman from addressing questions to anyone on the streets. See concurring opinion of Mr. Jusice White in *Terry v. Ohio,* 392 U.S. 1, 20 L.Ed. 2d 889, 88 S.Ct. 1868 (1968).

State v. Streeter

It follows that the search of defendant's person was incident to a lawful arrest and the fruits of the search were properly admitted in evidence. Neither his seizure under the circumstances revealed by this record nor the search of his person was unlawful by Fourth Amendment standards.

The Court of Appeals held, and properly so, that even in the absence of probable cause to arrest these officers had a right, upon the facts here, to search defendant for dangerous weapons for their own self-protection.

[4] Crimes of violence are on the increase, and officers are becoming the victims of such crimes in increasing numbers. As a result the necessity for officers to protect themselves and others in situations where probable cause for an arrest may be lacking is now recognized and permitted. Of course, North Carolina has no "stop and frisk" statute although many states do. See Raphael, "Stop and Frisk" in a Nutshell: Some Last Editorial Thrusts and Parries Before It All Becomes History, 20 Ala. L. Rev. 294 (1968). The lack of such statute, however, is not fatal to the authority of law enforcement officers in North Carolina to stop suspicious persons for questioning (field interrogation) and to search those persons for dangerous weapons (frisking). These practices have been a time-honored police procedure and have been recognized as valid at common law "as a reasonable and necessary police authority for the prevention of crime and the preservation of public order." *People v. Rivera,* 14 N.Y. 2d 441, 252 N.Y.S. 2d 458, 201 N.E. 2d 32 (1964), and authorities cited. *See also, United States v. Vita,* 294 F. 2d 524 (2d cir. 1961) ; Cook, Detention and the Fourth Amendment, 23 Ala. L. Rev. 387 (1970-71) ; LaFave, "Street Encounters" and the Constitution: Terry, Sibron, Peters and Beyond, 67 Mich. L. Rev. 40 (1968). Since the common law, unless abrogated or repealed by statute, is in full force and effect in this State, G.S. 4-1, the absence of statutory authority to stop and frisk does not render these common law practices illegal in our State.

Nor does the Federal Constitution prohibit them when they are reasonably employed. In *Terry v. Ohio,* 392 U.S. 1, 20 L.Ed. 2d 889, 88 S.Ct. 1868 (1968), the Court held, among other things, that "the central inquiry under the Fourth Amendment [is] the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal liberty. * * *

[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."

The Court then recognized that it is not always unreasonable to seize a person and subject him to a limited search for weapons where there is no probable cause for an arrest, stating: "[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such person in an attempt to discover weapons which might to be used to assault him." *Terry v. Ohio, supra.*

[5]   Thus, if the totality of circumstances affords an officer reasonable grounds to believe that criminal activity may be afoot, he may temporarily detain the suspect, If, after the detention, his personal observations confirm his apprehension that criminal activity may be afoot and indicate that the person may be armed, he may then frisk him as a matter of self-protection. *Terry v. Ohio, supra. See Adams v. Williams,* 407 U.S. 143, 32 L.Ed. 2d 612, 92 S.Ct. 1921 (1972).

[6]   When the foregoing principles are applied to the facts in this case, it is apparent that when Officer Bullock saw the bulge protruding beneath defendant's shirt under suspicious circumstances at 2:45 a.m. on a deserted street, it was entirely reasonable by Fourth Amendment standards to conduct a limited protective search for weapons immediately. Contraband evidence of crime necessarily exposed by the limited weapons search is evidence lawfully obtained, and neither the Fourth Amendment nor G.S. 15-27(a) excludes it.

State v. Streeter

For the reasons herein stated the decision of the Court of Appeals upholding the verdict and judgment is

Affirmed.

Justice SHARP concurs in result.

Justice HIGGINS dissenting.

Certain parts of the evidence which I deem material are not referred to in the Court's opinion.

At the time here involved, 2:45 in the morning, Officer Bullock and a companion were on routine patrol, not investigating any particular offense and not in search of any suspect for any offense. Officer Bullock testified: "When I first observed the defendant he was on West Fifth Street. He was approximately five feet from the road pavement. . . . I stopped the defendant because he turned around and looked at me and looked back. I didn't see who it was and at that time of the morning I thought it was my job to see who it was. I did not ask permission to search the defendant before I touched that object. The shirt came down over the object and I could not see anything. The bulge was on the right hand side on his hip. . . . I thought the object underneath the defendant's shirt was a gun. I thought it was a gun by instinct."

The officer further testified that the first object he removed from the defendant's pocket was a glove. He testified that the object he touched was a screwdriver. After finding the object in the defendant's pocket was not a pistol, he continued the search and removed another glove, a pry bar, a flashlight, and a money bag from the defendant's pocket. These objects were offered in evidence over the defendant's objection. Their admissibility, of course, depended on the legal validity of the search which produced them.

Every citizen has a constitutional right to be free from unreasonable search and seizure. Neither the lawmaking body, nor the Court can take the right away. A seizure of the person takes place when the law enforcement officer by physical force or show of authority curtails the liberty of the citizen to go and come as he pleases. Before the officer places a hand on the person of a citizen in search of anything, he must have constitutionally adequate ground for doing so. *Terry v. Ohio,* 392

U.S. 1. A lawful search of the person may be made in two instances: (1) Where the officer has a valid warrant; (2) where a protective search is made incident to a lawful arrest without a warrant. In a later case the Supreme Court of the United States in *Sibron v. New York*, 392 U.S. 40, states the rule: "In the case of the self-protective search for weapons, he [officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous."

In the case now before us, the hour was 2:45 a.m. The defendant was on a public street in Greenville. There was no curfew in effect. The defendant looked at the officers as they approached. This fact the officer cites as one of the reasons why he became suspicious and considered it his duty to investigate further. Obviously, at the time and under the circumstances it would have been more suspicious if the defendant had refused to look in the direction of the officers. When the officers stopped and interrogated the defendant, Officer Bullock saw a bulge in the defendant's hip pocket. Without permission he placed his hand on the object, found it was metal, and proceeded to search, ascertaining that the metal object was a screwdriver. At this juncture it would seem that the officer should have been satisfied that his instinct had misled him. However, instead he proceeded to continue the search, emptying the defendant's pockets. This sort of search is described by the Supreme Court of the United States in these words: "A general exploratory rummaging." *Coolidge v. New Hampshire*, 403 U.S. 443, 29 L.Ed. 2d 564.

Nowhere have I been able to find where a court has approved a search with so little factual background. The cases where the court has approved a search have been connected with recent violations of the law and the persons searched were in close proximity thereto. In *Robinson v. Commonwealth*, 207 Ky. 53, the arresting officer could see the outlines of a pistol and identified it as such on the person of the defendant. In *Banks v. Commonwealth*, 202 Ky. 762, the officer heard shots, thereafter saw a bulge in the defendant's pocket, arrested him, and obtained the pistol. In *U. S. v. Lee*, 271 A. 2d 566, the defendant was observed outside a store which had been robbed. The police asked for his identification and when he reached for his wallet, they noticed a bulge under his shirt, frisked him, and found the pistol. In *Williams v. State*, 253 A. 2d 786, officers

stopped a suspect who was leaving the scene of a homicide. He matched the description given and when the officer noticed a bulge, he searched and found a pistol.

Though not raised in the record or discussed in the briefs is the question whether the objects found on the defendant are within the proper definition of burglary tools or implements of housebreaking and whether the defendant possessed them without lawful excuse. The defendant testified he was on his way to Samuel Dixon's house. All the tools are suitable to legitimate use. *State v. Morgan,* 268 N.C. 214, 150 S.E. 2d 377; *State v. Garrett,* 263 N.C. 773, 140 S.E. 2d 315. A small pry bar is in general use in practically every home as a bottle or can opener. If we concede the implements may be within the contained classification, their discovery cannot be used to authorize a search for a pistol. "Such unlawful search is not made lawful because of resulting discoveries." *State v. McCloud,* 276 N.C. 518, 173 S.E. 2d 753. See also *Mapp v. Ohio,* 367 U.S. 643, 6 L.Ed. 2d 1081.

I vote to reverse the decision of the Court of Appeals.

Chief Justice BOBBITT joins in this dissenting opinion.