IN THE SUPREME COURT OF NORTH CAROLINA

No. 208PA22

Filed 15 December 2023

STATE OF NORTH CAROLINA

v.

MELVIN RAY WOOLARD, JR.

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review order granting defendant's motion to suppress entered on 29 March 2022 by Judge Darrell B. Cayton Jr. in District Court, Beaufort County. Heard in the Supreme Court on 13 September 2023.

*Joshua H. Stein, Attorney General, by Kathryne E. Hathcock, Special Deputy Attorney General, for the State-appellant.*

*The Robinson Law Firm, P.A., by Leslie S. Robinson, for defendant-appellee.*

EARLS, Justice.

On 11 April 2020, Captain Rodney Sawyer arrested Melvin Woolard Jr. for driving while impaired. Before trial, Mr. Woolard moved to suppress evidence seized during his arrest. The district court preliminarily granted his motion, ruling that Captain Sawyer lacked probable cause to suspect Mr. Woolard of drunk driving.

The State appealed that decision to superior court. That court also found that Mr. Woolard's arrest violated the Fourth Amendment. At the superior court's instruction, the district court entered a final order suppressing the evidence. Dissatisfied with that ruling, the State sought review in the Court of Appeals and

then this Court. We agreed to review the district court's final order.

The question before us is simple: Did Captain Sawyer have probable cause to arrest Mr. Woolard for impaired driving? Our answer is yes. Drawing on the district court's factual findings, we hold that Captain Sawyer's "belief of guilt" was objectively reasonable and rooted in concrete evidence. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Because Mr. Woolard's arrest thus satisfied the Fourth Amendment, we reverse the district court's suppression order and remand this case for further proceedings.

## I.    Facts

### A. The Arrest

On the afternoon of 11 April 2020, Captain Sawyer—a State Highway Patrol Officer—was driving along a rural road in Beaufort County. For a while, he found himself a solo traveler.

That changed when a truck pulled onto the road in front of him. Captain Sawyer and the truck were the only cars in sight. About a mile separated them. Like Captain Sawyer, the truck travelled south. But unlike Captain Sawyer, the truck wove in and out of its lane.

The officer watched as the truck darted over the centerline—six to seven times by his count. Twice, the truck lurched into the oncoming lane. And at one point, it even skidded onto the road's right shoulder.

Concerned, Captain Sawyer flashed his lights to stop the truck. The other

driver quickly pulled over. Although canals and ditches flanked both sides of the road, the truck avoided them as it stopped.

As Captain Sawyer approached the truck, he saw Mr. Woolard behind the wheel. A woman sat beside him. On first glance, Mr. Woolard seemed normal. Captain Sawyer saw no alcohol or contraband in the truck, and nothing in the vehicle alarmed him.

The officer told Mr. Woolard the reason for the stop: Mr. Woolard's erratic driving. Mr. Woolard replied that he was headed to work. He explained that he noticed bees inside the truck, and his efforts to shoo them out the window caused him to swerve. At Captain Sawyer's request, Mr. Woolard produced his driver's license and registration.

As they spoke, Captain Sawyer smelled alcohol on Mr. Woolard's breath and from inside his truck. The officer's suspicions grew when he noticed Mr. Woolard's flushed cheeks, and red and glassy eyes. Still, Mr. Woolard seemed coherent—he chatted normally with Captain Sawyer and appeared in control of his mind and body.

Captain Sawyer returned to his patrol car to check Mr. Woolard's license and registration. He found "nothing unusual." But back at Mr. Woolard's truck, Captain Sawyer questioned him about the smell of alcohol. Mr. Woolard confessed that he drank "a couple of beers earlier."

At that point, Captain Sawyer asked Mr. Woolard to take a preliminary breath test (PBT). Mr. Woolard agreed. As he exited his truck, Mr. Woolard's balance was

unremarkable.

Captain Sawyer gave Mr. Woolard two PBTs and a Horizontal Gaze Nystagmus (HGN) test. During an HGN test, an officer checks for involuntary nystagmus—the jerking or fluttering of the eyes—as a person watches an object move.[1] *See State v. Helms*, 348 N.C. 578, 579 (1998). As that object "travels toward the outside of the subject's vision," the officer monitors whether the eyes twitch or bounce. *Id.* at 580. If they do—especially before the "object has traveled 45 degrees from the center of the person's vision"—it signals intoxication. *Id.* At six points during the HGN test, an officer notes "clues" of impairment. The more clues he gathers, the more likely the driver is impaired. When Captain Sawyer tested Mr. Woolard, he logged all six possible clues.

After the HGN test, Captain Sawyer arrested and charged Mr. Woolard for driving while impaired in violation of N.C.G.S. § 20-138.1(a)(1). In relevant part, that statute prohibits people from "driv[ing] any vehicle upon any highway, any street, or any public vehicular area within this State" while "under the influence of an impairing substance." N.C.G.S. § 20-138.1(a)(1) (2021).[2]

---

[1] We have more precisely defined "nystagmus" as "a physiological condition that involves an involuntary rapid movement of the eyeball, which may be horizontal, vertical, or rotary. An inability of the eyes to maintain visual fixation as they are turned from side to side (in other words, jerking or bouncing) is known as horizontal gaze nystagmus, or HGN." *See State v. Helms*, 348 N.C. 578, 579 (1998) (cleaned up).

[2] Under our precedent, a person is "under the influence of intoxicating liquor or narcotic drugs"—and thus in violation of N.C.G.S. § 20-138.1—when "he has drunk a sufficient quantity of intoxicating beverages or taken a sufficient amount of narcotic drugs to cause him to lose the normal control of his bodily or mental faculties, or both, to such an

## B. The Suppression Ruling

Mr. Woolard's case came before Judge Darrell B. Cayton Jr. of District Court, Beaufort County. Before trial, Mr. Woolard moved to suppress portions of the State's evidence.

Mr. Woolard first challenged the PBT results. In his view, Captain Sawyer broke from the procedures set by N.C.G.S. § 20-16.3(c). That provision—aptly titled "Tests Must Be Made with Approved Devices and in Approved Manner"—instructs that "No screening test for alcohol concentration is a valid one" unless "conducted in accordance with the applicable regulations of the Department as to the manner of its use." N.C.G.S. § 20-16.3(c) (2021). When Captain Sawyer tested Mr. Woolard, those "applicable regulations" required him to first ensure that Mr. Woolard "removed all food, drink, tobacco products, chewing gum and other substances and objects from his mouth." 10A N.C. Admin. Code 41B.0502 (2022). Because the officer neglected to do so, Mr. Woolard faulted the PBTs as unreliable and procedurally defective. The district court agreed and excluded them.

Mr. Woolard also disputed the HGN test. Although no statute sets specific protocols, Mr. Woolard pointed to the procedures recommended by the National Highway Traffic Safety Association (NHTSA). Because Captain Sawyer diverged from those protocols, Mr. Woolard argued, the HGN test—like the PBTs—should be

---

extent that there is an appreciable impairment of either or both of those faculties." *See State v. Parisi*, 372 N.C. 639, 649–50 (2019) (quoting *State v. Carroll*, 226 N.C. 237, 241 (1946)).

discarded. The district court disagreed. Although Captain Sawyer strayed from the NHSTA's guidelines, the court reasoned that his oversight went to the weight of the HGN results, "not their admissibility."[3]

Most relevant here, Mr. Woolard urged the district court to suppress evidence seized during his arrest. In his view, that arrest violated the Fourth Amendment because Captain Sawyer lacked probable cause to suspect him of impaired driving. The district court agreed and entered a Pre-Trial Indication to suppress the evidence. It filed a written order soon after.

## C. The State's Appeals

The State sought review from the Superior Court, Beaufort County as permitted by statute. *See* N.C.G.S. 20-38.7(a) (2021). That court also found that Captain Sawyer lacked probable cause to arrest Mr. Woolard for impaired driving. The superior court thus directed the district court to suppress the evidence. A few weeks later, the district court entered its final suppression order.

The State disagreed with that ruling and petitioned the Court of Appeals for a writ of certiorari. When that court denied its request, the State sought this Court's review. We granted certiorari to examine the district court's final suppression order.

---

[3] Specifically, the district court noted that Captain Sawyer "testified the time period to conduct a pass on the lack of smooth pursuit for both the left and right eye was a total of two seconds for both eyes, not the four seconds required for each eye (total of 8 second for one pass of both eyes). [Captain] Sawyer testified the speed for passing the stimulus on the maximum deviation pass was the same and that the stimulus should be held for three seconds at maximum deviation not the four seconds required."

## II.   This Court's Jurisdiction and the Scope of Our Review

## A. Jurisdiction

Before reaching the merits, we resolve two procedural issues. First, Mr. Woolard disputes whether this Court may hear his case at all. In his view, the State improperly leapfrogged the superior court. According to Mr. Woolard, the State needed to go to superior court before seeking review from the Court of Appeals. And since the State broke the proper chain of appeal, Mr. Woolard urges, it improperly sought certiorari and we improperly granted its petition.

However, the State's petition does fall within our certiorari jurisdiction. Under Rule 21, parties may seek a writ of certiorari in "appropriate circumstances" to appeal the "orders of trial tribunals when . . . no right of appeal from an interlocutory order exists." N.C. R. App. P. 21. The State's petition here fits that condition. For one, the district court's final suppression order is interlocutory. Though it excludes portions of the State's evidence, it requires "further action by the trial court in order to settle and determine the entire controversy." *Veazey v. City of Durham*, 231 N.C. 357, 362 (1950); *cf. State v. Fowler*, 197 N.C. App. 1, 5–6 (2009), *disc. rev. denied and appeal dismissed*, 364 N.C. 129 (2010) (concluding that a superior court order allowing motion to suppress did not end a criminal case because, even if the ruling "may have the same 'effect' of a final order," it "requires further action for finality").

The question, then, is whether the State could appeal that interlocutory order as of right. If not, Rule 21 allowed it to petition this Court for certiorari. The parties

disagree on that score. According to the State, it lacks a statutory vehicle to challenge the district court's ruling. And because the order is not a "final disposition" of Mr. Woolard's case, the State is suspended in procedural limbo—an "interlocutory no-man's land." With no avenue to appeal the suppression order, the State contends, a writ of certiorari was its only opportunity to seek review.[4] Mr. Woolard, on the other hand, points to statutes purportedly allowing the State to obtain redress in the superior court. According to him, the State could—and should—have used those statutory mechanisms before seeking certiorari from the Court of Appeals.

After examining the statutory scheme, it is apparent that no provision authorized the State to challenge the district court's final order in superior court. And because the State could not appeal that final order and would otherwise be marooned in an "interlocutory no-man's land," Rule 21 allowed it to petition this Court for certiorari. *See* N.C. R. App. P. 21.

When Mr. Woolard moved to suppress evidence, the district court preliminarily granted his motion. At that stage, its decision was tentative. Under N.C.G.S. § 20-38.6(f), the district court could not enter a "final judgment on the motion" until the

---

[4] Counsel for the State underscored this point at oral argument. Specifically, the State explained that it "is stuck in this interlocutory no-man's land, for lack of a better word. The case has not been called yet for trial, so there's nothing for the State to appeal. But the State also has an ethical obligation not to move forward with evidence that has been suppressed. So the State can't appeal, and the State can't move forward unless the suppressed evidence is reversed. So there is no way for the State to appeal."

State appealed its ruling and the superior court reviewed it.[5] N.C.G.S. § 20-38.6(f) (2021). Another statute—N.C.G.S. § 20-38.7(a)—allowed the State to challenge the district court's decision in the superior court. *See* N.C.G.S. § 20-38.7(a) (2021). So when the district court provisionally granted Mr. Woolard's suppression motion, the State could use subsection 20-38.7(a) to contest that ruling.

But that statute only covers a district court's "*preliminary* determination granting a motion to suppress." *Id.* (emphasis added). That makes the difference in Mr. Woolard's case. After the superior court affirmed the district court's ruling, it directed the entry of a final order suppressing the evidence. And when the district court complied, its "preliminary determination" became a "final judgment on the motion." *Id.*; N.C.G.S. § 20-38.6(f). Because that order was final, the State could no longer use section 20-38.7 to challenge it.

In other words, the State had to look elsewhere for a right of appeal. And per subsection 20-38.7(a), "[a]ny further appeal shall be governed by Article 90 of Chapter 15A." But those statutes, too, offer little help to the State. By its terms, section 15A-1432—the provision parsing the State's right to contest a district court decision in superior court—sweeps narrowly. *See* N.C.G.S. § 15A-1432(a) (2021). It lets the State challenge just two species of district court rulings: (1) a "decision or judgment dismissing criminal charges," and (2) the grant of "a motion for a new trial on the

---

[5] We note as well that the district court may "enter a final judgment on the motion" if the State "has indicated it does not intend to appeal." N.C.G.S. § 20-38.6(f).

ground of newly discovered or newly available evidence." *See* N.C.G.S. § 15A-1432(a)(1)–(2). But that provision is silent on whether the State may appeal a district court's *final suppression order* to superior court. And without a "statute clearly conferring that right," the State here could not challenge the district court's ruling. *State v. Harrell*, 279 N.C. 464, 466 (1971) (quoting *State v. Vaughan*, 268 N.C. 105, 108 (1966)). In short, the State was up a creek without a statutory paddle.

Our Court of Appeals has twice faced a similar issue. *See Fowler*, 197 N.C. App. at 5–8; *State v. Palmer*, 197 N.C. App. 201 (2009), *disc. rev. denied and appeal dismissed*, 363 N.C. 810 (2010). And twice, that court has rejected the State's efforts to conjure up a right of appeal where none exists. In *Fowler*, for instance, the court interpreted subsection 20-38.7(a) and section 15A-1432, the provisions at issue here. *See Fowler*, 197 N.C. App. at 6. In that case—like this one—the district court preliminarily granted the defendant's motion to suppress. *Id.* at 4. And in that case—like this one—the superior court affirmed that ruling. *Id.* The difference between *Fowler* and Mr. Woolard's case: In *Fowler*, the State appealed the superior court's decision *before* the district court entered a final order. *Id.* at 4–5.

According to the Court of Appeals, the State erred by doing so, as it lacked a statutory right to challenge the superior court's ruling. *Id.* at 7. The State, for its part, tried to stitch together a right to appeal from different statutes. *See id.* at 6–7. Subsection 20-38.7(a), it noted, allowed it to appeal a district court's "preliminary determination" to superior court. *Id.* at 6. And that provision—read alongside

subsection 15A-1432(e)—permitted it to then contest the superior court's ruling in the Court of Appeals. *Id.*

The Court of Appeals, however, disagreed. *Id.* at 6–8. By its plain text, the court explained, subsection 20-38.7(a) gave the State "a right of appeal to superior court from a district court's *preliminary* determination indicating that it *would* grant a defendant's pretrial motion to *dismiss or suppress.*" *Id.* at 7. Section 15A-1432, however, covered different ground. *Id.* If the district court dismissed the charges against a defendant or granted a new trial, subsection 15A-1432(a) allowed the State to seek review in superior court. *Id.* And if the superior court affirmed the district court, subsection 15A-1432(e) allowed the State to challenge that ruling in the Court of Appeals. *Id.*

But the State's right of appeal ended there. *Id.* By their plain language, the statutes withheld from the State a vehicle to appeal a district court's final suppression order. *Id.* at 29–30. To challenge that decision, the Court of Appeals explained, the State had to rely on other statutes or remedial writs. *See id.* at 8, 29. Writs like the writ of certiorari.

Though *Fowler* and *Palmer* concluded that the State had no statutory right to raise its claims, the court in both cases "exercised [its] discretion to grant the State's petition for writ of certiorari." *Fowler*, 197 N.C. App. at 8; *Palmer*, 197 N.C. App. at 204. Rule 21, the court reasoned, was crafted for just these cases—those where no right of appeal exists. *See Fowler*, 197 N.C. App. at 8; *Palmer*, 197 N.C. App. at 204.

When a party "is without any other remedy," a writ of certiorari fills the gaps, permitting appellate courts to intervene when they could otherwise not. *See Bayer v. Raleigh & Augusta Air Line R.R. Co.*, 125 N.C. 17, 20 (1899); *see also id.* at 25 ("It seems to us . . . that, to refuse the writ in this case, 'the defendant would be undone.' ").

The same is true of the State's petition here. Because no statute allowed the State to appeal the district court's final suppression order, it lacked a statutory basis to challenge that ruling in superior court. And since the State had no "right of appeal from an interlocutory order," N.C. R. App. P. 21, it could petition this Court for certiorari. *Warren v. Maxwell*, 223 N.C. 604, 608 (1943) (underscoring that "the proper method of review is by *certiorari*" if "there has been an error in law, prejudicial to the parties" and a "statute provides no appeal").

Despite Mr. Woolard's arguments, we did not err by issuing the writ. In large part, that is because our jurisdiction is constitutionally etched. N.C. Const. art. IV, §§ 1, 12. We may "review upon appeal any decision of the courts below, upon any matter of law or legal inference." N.C. Const. art. IV, § 12(1). And we may "issue any remedial writs necessary to give [us] general supervision and control over the proceedings of the other courts." *Id.*

Certiorari, of course, is an "extraordinary remedial writ." *State v. Roux*, 263 N.C. 149, 153 (1964). We deploy it sparingly, reserving it "to correct errors of law," *State v. Simmington*, 235 N.C. 612, 613 (1952), or to cure a "manifest injustice," *State*

*v. Cochran*, 230 N.C. 523, 526 (1949). To that end, a petitioner must "show merit or that error was probably committed below." *Cryan v. Nat'l Council of YMCA*, 384 N.C. 569, 572 (2023) (cleaned up). In the past, this Court has granted certiorari to resolve legal questions raised by interlocutory orders in criminal cases, even when the petitioner lacked a right of appeal. *See, e.g., State v. Jefferson*, 66 N.C. 309 (1872) (noting that petitioner had no right to appeal but still issuing writ of certiorari to review whether the trial court erroneously discharged a criminal jury); *Ex parte Biggs*, 64 N.C. 202 (1870).

Ultimately, though, the writ is "discretionary." *See State v. Ross*, 369 N.C. 393, 400 (2016) (citing *Womble v. Moncure Mill & Gin Co.*, 194 N.C. 577, 579 (1927)). And here, since the State is "without any other remedy" to challenge the district court's final suppression order, it could seek—and we could grant—a writ of certiorari. *See Bayer*, 125 N.C. at 20. In this case, we exercised our "sound discretion" to release the State from procedural limbo. *See State v. Niccum*, 293 N.C. 276, 278 (1971). This does not mean we should deploy our certiorari jurisdiction whenever the State loses a motion to suppress in these circumstances. But since we properly granted the writ in this case, we have jurisdiction to reach the merits.

## B. Scope of Review

With our jurisdiction settled, we next clarify *what* we review. After Mr. Woolard moved to suppress evidence, the district court "preliminarily indicate[d that] the motion should be granted." *See* N.C.G.S. § 20-38.6(f). On review, the superior

court affirmed the district court's ruling and directed it to "enter its final order." The district court complied—in a 29 March 2022 order, it adopted the Pre-Trial Indication as its final decision.

The district court's final order is the only one before us. We do not consider the superior court's ruling or the Court of Appeals' denial of certiorari. Because we examine the district court's order alone, we rest our analysis on that court's factual findings.[6]

### III.   Standard of Review

This Court reviews a trial court's suppression order in two steps. *See State v. Bullock*, 370 N.C. 256, 258 (2017). We first ask "whether the trial court's underlying findings of fact are supported by competent evidence." *State v. Parisi*, 372 N.C. 639, 649 (2019) (cleaned up). We then examine "whether those factual findings in turn support the trial court's ultimate conclusions of law." *Id.* (cleaned up).

Under that framework, we start with the facts. And here, that step is key because probable cause is context-specific—it hinges "on the totality of the circumstances present in each case." *State v. Sanders*, 327 N.C. 319, 339 (1990)

---

[6] At oral argument the State contended that the district court's final order "adopted" or "incorporated" the superior court's factual findings. We disagree. In its final order, the district court specified that "the Pre-Trial Indication entered by the Court on 15 November 2021 is now the final order of the Court." The district court never mentioned the superior court's factual findings. True, if "there is a dispute about the findings of fact," the superior court may "determine the matter de novo." N.C.G.S. § 20-38.7(a). But here, it does not appear that the State disagreed with the district court's factual conclusions or challenged them in superior court. Because the district court relied solely on its findings of fact, we, too, rely on those findings in reviewing its final order.

(cleaned up); *see Ker v. California*, 374 U. S. 23, 33 (1963). The trial court's findings steer our review. *See Parisi*, 372 N.C. at 655; *see also State v. Bartlett*, 368 N.C. 309, 313 (2015). Because that tribunal is closer to the case and steeped in the evidence, it is better equipped to distill "what happened in space and time." *Parisi*, 372 N.C. at 655 (quoting *State ex rel. Utils. Comm'n. v. Eddleman*, 320 N.C. 344, 351 (1987)).

In cases like Mr. Woolard's, then, the district court gauges "the actual observations made by arresting officers" and "the extent to which a person suspected of driving while impaired exhibits indicia of impairment." *Id.* at 656. If backed "by competent evidence," we treat those findings as "conclusive on appeal." *State v. Eason*, 336 N.C. 730, 745 (1994).

At the second step, we decide whether—based on the facts—Captain Sawyer had probable cause as a matter of law. That task "inherently requires" us to exercise judgment and apply "legal principles." *Parisi*, 372 N.C. at 655 (cleaned up). For that reason, probable cause is a legal question. *Id.* at 656; *see also Ornelas v. United States*, 517 U.S. 690, 697–98 (1996). And for the same reason, we review it de novo. *See Parisi*, 372 N.C. at 655. We thus examine the issue with fresh eyes and may "freely substitute" our judgment for the district court's. *Id.* (quoting *State v. Biber*, 365 N.C. 162, 168 (2011)).

## IV.    Probable Cause to Arrest for Impaired Driving

### A. Probable Cause Standard

Before arresting a person, an officer must have probable cause to suspect him

of a crime "at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *State v. Streeter*, 283 N.C. 203, 207 (1973). That requirement is key to the Fourth Amendment's protections, and its roots grow "deep in our history.*" Bailey v. United States*, 568 U.S. 186, 192 (2013) (quoting *Henry v. United States*, 361 U.S. 98, 100 (1959)). The Founders' "[h]ostility to seizures based on mere suspicion" spurred the Fourth Amendment's adoption and served as the springboard for its probable-cause requirement. *Dunaway v. New York*, 442 U.S. 200, 213 (1979); *see also Stanford v. Texas*, 379 U.S. 476, 481 (1965). In purpose and practice, the probable-cause standard shields "citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime." *Pringle*, 540 U.S. at 370 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

Probable cause to arrest exists when an officer has a reasonable belief, anchored in specific facts and objectively rational inferences, that a particular person has committed a crime. *See id.*; *see also Beck v. Ohio*, 379 U.S. 89, 91 (1964). Under that framework, we take the "facts as a whole" rather than "one by one." *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018); *see also Sanders*, 327 N.C. at 339. And though officers must find a "particularized and objective basis for suspecting legal wrongdoing," *United States v. Arvizu*, 534 U.S. 266, 273 (2002), they are not required "to rule out a suspect's innocent explanation for suspicious facts," *Wesby*, 583 U.S. at 61.

But not all evidence satisfies the Fourth Amendment. An officer may not arrest

based on a "mere hunch" or gut feeling. *See Arvizu,* 534 U.S. at 274 (cleaned up); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989*); State v. Jackson*, 368 N.C. 75, 78 (2015). Nebulous suspicions are also insufficient—an officer's "belief of guilt must be particularized with respect to the person to be searched or seized." *Pringle*, 540 U.S. at 371 (citing *Ybarra v. Illinois*, 444 U. S. 85, 91 (1979)). So the key question is whether a reasonable officer would find a supported, "good faith," and objectively rational basis to suspect a person of a crime. *See State v. Zuniga*, 312 N.C. 251, 262 (1984); *see also Biber*, 365 N.C. at 169.

Those principles apply on the road, too. An officer has probable cause to arrest for impaired driving when, under the "totality of the circumstances," he reasonably believes that a motorist "consumed alcoholic beverages" and drove "in a faulty manner or provided other indicia of impairment." *Parisi*, 372 N.C. at 651. Our cases have plotted what evidence may support that belief. Erratic driving, we have explained, provides strong grounds for suspicion. *Id.*; *see State v. Otto*, 366 N.C. 134, 138 (2012) (finding reasonable suspicion for traffic stop based on the defendant's "constant and continual" weaving for three quarters of a mile on a weekend evening). So too does the "fact that a motorist has been drinking." *Parisi*, 372 N.C. at 650 (citing *State v. Hewitt*, 263 N.C. 759, 764 (1965)); *cf. State v. Ellis*, 261 N.C. 606, 607 (1964).

"[O]ther conduct" may also suggest impairment. *Parisi*, 372 N.C. at 650. Take the smell of alcohol on a motorist. That fact, "*standing alone*, is no evidence that a driver is under the influence of an intoxicant." *State v. Rich*, 351 N.C. 386, 398 (2000)

(cleaned up). But it may signal "that [the driver] has been drinking," especially when coupled with other clues. *Atkins v. Moye*, 277 N.C. 179, 185 (1970); *cf. State v. Romano*, 369 N.C. 678, 693 (2017) (noting that defendant "smelled strongly of alcohol"). The same holds true when a driver has red and glassy eyes. *Parisi*, 372 N.C. at 650–51 (cataloguing cases). And field-sobriety tests—performed in line with statutory and constitutional standards—may offer reliable metrics of impairment. *Id.* at 653 (noting that the "defendant exhibited multiple indicia of impairment while performing various sobriety tests"); *see Romano*, 369 N.C. 678; *State v. Godwin*, 369 N.C. 604, 612–13 (2017) (allowing an officer, properly qualified as an expert, to testify about HGN tests).

Any single fact alone may not establish probable cause. But taken together, they may clear that hurdle. The probable-cause inquiry is, after all, an additive one. *See Wesby*, 583 U.S. at 61. And so courts—like officers—must examine "each case in the light of the particular circumstances and the particular offense involved." *State v. Harris*, 279 N.C. 307, 311 (1971); *see also Atkins*, 277 N.C. at 185 ("[T]he fact that a motorist has been drinking, when considered in connection with faulty driving or other conduct indicating an impairment of physical or mental faculties, is sufficient *prima facie* to show a violation of [section] 20-138." (cleaned up)).

We most recently tackled this topic in *Parisi*. In that case, a police officer stopped Mr. Parisi's car at a checkpoint. *Parisi*, 372 N.C. at 640. After requesting his license, the officer smelled alcohol on Mr. Parisi's breath and noticed his "glassy and

watery" eyes. *Id.* An "open box of beer" sat "on the passenger's side floorboard," though the officer did not see any open containers. *Id.* When asked, Mr. Parisi admitted that he had been drinking that evening—three beers, all told. *Id.*

On top of those observations, the officer conducted field-sobriety tests. *Id.* Each confirmed Mr. Parisi's intoxication. On the HGN test, Mr. Parisi showed six clues of impairment. *Id.* On the walk-and-turn test, he miscounted his steps walking each way. *Id.* And on the one-leg-stand test, he swayed and held out his arms to balance. *Id.*

To the officer, the evidence suggested that Mr. Parisi had consumed enough "alcohol to appreciably impair his mental and physical faculties." *Id.* He thus arrested and charged Mr. Parisi for driving while impaired. *Id.* at 640–41. But the trial court disagreed. *Id.* at 641. On Mr. Parisi's motion, that court suppressed evidence seized during his arrest, holding that the officer lacked probable cause. *Id.* The Court of Appeals reversed that decision.

We unanimously affirmed the Court of Appeals. In our view, a "prudent officer" viewing all the evidence would reasonably suspect Mr. Parisi of drunk driving. *Id.* at 650. We noted:

- That Mr. Parisi "had been driving";

- That he "admitted having consumed three beers";

- That his "eyes were red and glassy";

- That "a moderate odor of alcohol emanated from [his] person"; and

- That he "exhibited multiple indicia of impairment while performing various sobriety tests."

*Id.* at 653.

Given those facts, we had "no hesitation" in finding probable cause. *Id.* That was so, we explained, because a "prudent officer" in the same position would harbor the same suspicions. *Id.* at 650. And since the officer reasonably believed that Mr. Parisi "consumed alcohol" and that "his faculties were appreciably impaired," Mr. Parisi's arrest squared with the Fourth Amendment. *Id.* at 655.

## B. Application

Because probable cause pivots on the facts, we rely on the district court's findings. *See id.* at 649. We start where Captain Sawyer did—with Mr. Woolard's erratic driving. As he trailed Mr. Woolard, the officer watched him swerve over the centerline six to seven times. Twice, Mr. Woolard ventured into the oncoming lane. And Mr. Woolard veered the other way, too—at one point, he drifted off the asphalt and onto the road's right shoulder.

Concerned, Captain Sawyer pulled Mr. Woolard over to investigate his weaving. And during that stop, the clues of impairment mounted. As in *Parisi*, Captain Sawyer smelled alcohol on Mr. Woolard's breath and from inside his truck. *See id.* at 653. As in *Parisi*, he noticed Mr. Woolard's red and glassy eyes. *See id.* And as in *Parisi*, Mr. Woolard admitted that he drank several beers before driving. *See id.*

Captain Sawyer supplemented his observations with an HGN test.[7] When checking Mr. Woolard's eyes for nystagmus, Captain Sawyer logged all six clues of impairment—another parallel to *Parisi. See id.*

So "at the time of the arrest," *Devenpeck,* 543 U.S. at 152, Captain Sawyer faced these facts:

- That while driving, Mr. Woolard veered over the centerline six to seven times;

- That he twice swerved into the oncoming lane;

- That he skated onto the right shoulder of the road;

- That the inside of his truck smelled of alcohol;

- That his breath smelled of alcohol, too;

- That his eyes were red and glassy;

- That he confessed to drinking "a couple of beers" before driving; and

- That he showed all six clues of impairment on the HGN test.

In Mr. Woolard's view, that evidence does not amount to probable cause. As he tells it, he swerved on the road because he was shooing bees out of his truck. Besides, he continues, some evidence cut *against* his impairment. When pulling over, Mr. Woolard deftly avoided the ditches flanking the road. He spoke and acted normally

---

[7] Although the State also challenges the trial court's suppression of the PBTs, it did not appeal the trial court's orders on those tests. *See* State's Petition for Writ of Certiorari at 1, 12, *State v. Woolard*, No. 208PA22 (N.C. July 8, 2022) (seeking this Court's "review of the Beaufort County district court's Order of Suppression"). Nor did we grant certiorari to examine those rulings. Instead, we agreed only to consider the district court's final suppression order and whether, based on its factual findings, that court correctly determined whether Captain Sawyer had probable cause to arrest.

during the traffic stop. He retrieved his license without difficulty. And he easily exited the truck when asked. So according to Mr. Woolard, the "whole picture" of the evidence negated Captain Sawyer's suspicions. *See United States v. Cortez,* 449 U.S. 411, 417 (1981).

However, an "objectively reasonable police officer" in Captain Sawyer's shoes would draw the same conclusions that he did. *See Pringle*, 540 U.S. at 371. Though duly considered, Mr. Woolard's arguments do not change our holding. While the totality of the circumstances may include a defendant's explanations for his conduct, probable cause does not require officers to rule out a defendant's version of events. *See Wesby*, 583 U.S. at 61. What matters is whether a reasonable officer, viewing the "evidence as a whole," would have a "substantial basis" to suspect Mr. Woolard of a crime. *See State v. Lowe*, 369 N.C. 360, 364 (2016) (quoting *State v. Beam*, 325 N.C. 217, 221 (1989)); *accord Wesby,* 583 U.S. at 61.

We think that a reasonable officer would find a "substantial basis" to arrest in this case. *See Lowe*, 369 N.C. at 364 (cleaned up). As Mr. Woolard urges, his explanation of the incident ran counter to Captain Sawyer's suspicions of "wrongdoing." *Cf. Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020). A sober driver, after all, is more likely than a drunk one to navigate hilly terrain, retrieve his ID, chat normally, and follow instructions. But the "evidence as a whole" gave Captain Sawyer probable cause to suspect Mr. Woolard of impaired driving. *See Lowe*, 369 N.C. at 364 (cleaned up). Despite some arguably innocuous conduct, Mr. Woolard still drove

erratically; banked onto the road's shoulder; smelled of alcohol; had red, glassy eyes; admitted to drinking before driving; and showed every clue of impairment on the HGN test.

## V.  Conclusion

Probable cause is a "fluid concept," not a fixed formula. *See Ornelas*, 517 U.S. at 695–96 (cleaned up). It draws content from "particular factual contexts" as "viewed through the lens of common sense." *Florida v. Harris,* 568 U.S. 237, 244, 248 (2013) (cleaned up). For that reason, the constitutional doctrine rejects rigid rules in favor of a "flexible, all-things-considered approach." *Id.* at 244. We keep with that fact-intensive, "common-sensical standard" in this case. *Id.*

On these facts, we hold that Captain Sawyer had probable cause to arrest Mr. Woolard for impaired driving. An "objectively reasonable" officer in Captain Sawyer's shoes would discern a "substantial chance of criminal activity" from Mr. Woolard's erratic weaving; the smell of alcohol on his breath and in his truck; his red, glassy eyes; his admission to drinking; and his performance on the HGN test. *See Wesby*, 583 U.S. at 57, 61.

Because Captain Sawyer's "belief of guilt" was objectively reasonable and rooted in sound evidence, Mr. Woolard's arrest did not violate the Fourth Amendment. *See Pringle*, 540 U.S. at 371. The district court erred in holding the opposite. We thus reverse the district court's suppression order and remand Mr. Woolard's case for further proceedings.

REVERSED.